IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

JULY 1997 SESSION

FILED

October 30, 1997

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | C.C.A. NO. 01C01-9608-CC-00378 |
| Appellee, | ) | |
| | ) | WILLIAMSON COUNTY |
| VS. | ) | |
| | ) | HON. CORNELIA A. CLARK, |
| PATRICK K. LEWIS, II, | ) | JUDGE |
| PATRICK K. LEWIS and | ) | |
| DONNA LEWIS, | ) | |
| | ) | |
| Appellants. | ) | (Evading arrest, possession of marijuana, reckless endangerment) |

FOR THE APPELLANT:

DAVID L. RAYBIN
2210 SunTrust Center
424 Church St.
Nashville, TN   37219
(On appeal)

VIRGINIA LEE STORY
136 4th Ave. S.
P.O. Box 1608
Franklin, TN   37065
(At trial)

WILLIAM DON YOUNG, JR.
227 Bridge St.
Franklin, TN   37064
(At trial)

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

LISA A. NAYLOR
Asst. Attorney General
450 James Robertson Pkwy.
Nashville, TN  37243-0493

JOSEPH D. BAUGH
District Attorney General

JEFF BURKS
Asst. District Attorney General
P.O. Box 937
Franklin, TN   37065

OPINION FILED:_____

AFFIRMED IN PART; REVERSED AND
DISMISSED IN PART; AND REMANDED
IN PART

JOHN H. PEAY,
Judge

## **O P I N I O N**

Defendant Patrick K. Lewis, II ("Kelly") was indicted for driving under the influence, possession of marijuana, felony reckless endangerment, and evading arrest. Defendant Patrick K. Lewis ("Mr. Lewis"), Kelly's father, was indicted for evading arrest, being an accessory after the fact in the evasion of an arrest, and tampering with evidence. Defendant Donna Lewis ("Mrs. Lewis"), Kelly's mother, was indicted for aiding in an evasion of arrest, being an accessory after the fact in the evasion of an arrest, and two counts of tampering with evidence. All cases were consolidated for trial. The jury convicted Kelly of simple (misdemeanor) possession of marijuana, felony reckless endangerment, and evading arrest. It convicted Mr. and Mrs. Lewis of evading arrest and Mrs. Lewis of one count of tampering with evidence. The trial court subsequently entered a judgment of acquittal on the tampering with evidence conviction.

After a hearing, Kelly was sentenced on the felony conviction as an especially mitigated offender to nine tenths of a year incarceration, suspended, and two years probation.[1] On the misdemeanor possession charge, he was sentenced to six months jail, suspended, and eleven months, twenty-nine days probation. For the misdemeanor evading arrest conviction, he received six months' jail, suspended, and eleven months, twenty-nine days probation. Kelly was also fined $3,000 on the felony reckless endangerment offense, $2,000 on the possession offense, and $2,000 on the evading arrest offense. All sentences were run concurrently. Mr. Lewis was sentenced to thirty days in jail, suspended, and eleven months, twenty-nine days probation on the evading arrest charge and fined $2,500. Mrs. Lewis' sentence was identical to her husband's.

---

[1] As a condition of his probation on this charge, Kelly was ordered to serve twenty days on consecutive weekends in the county jail.

2

The defendants now join in this appeal as of right challenging their convictions for evading arrest. Defendant Kelly also challenges his conviction for reckless endangerment, asserts that the trial court erred in denying his request for judicial diversion on his possession of marijuana charge, complains that his fine on the possession charge was excessive, and asserts that his fines should be run concurrently rather than consecutively.[2] Upon our review of the record, we reverse all three convictions for evading arrest and dismiss those charges; remand this matter for further proceedings on Kelly's request for judicial diversion on the possession charge; and remand for reconsideration the fine imposed for the possession offense. In all other respects, we affirm the judgments below.

**FACTS**

On the evening of March 4, 1994, the defendant Kelly met his friend, James Walter Inman, for dinner at approximately 8:30 p.m., according to Kelly. During dinner, he drank approximately two beers. He left the restaurant between 10:00 and 10:30 p.m. At approximately 11:30 p.m., Kelly was driving home headed east on state highway 96. As he came down a hill and around a blind curve, he was temporarily blinded by oncoming headlights. According to his testimony, "I was having a very difficult time seeing. And I let off the gas to slow down and the [oncoming] car passed me. And when it passed me, I realized that I was up on the rear end of another vehicle that was stopped in the middle of the road."

The other vehicle belonged to Jason Rauschenberger who had stopped to make a left turn onto Clovercroft Road. Rauschenberger had stopped in order to allow an oncoming car to pass. According to Rauschenberger, as he began his left turn, a

---

[2]The defendants Mr. Lewis and Mrs. Lewis also challenge their sentences. In light of our disposition of their convictions, we find it unnecessary to address these sentencing issues.

3

"[c]ar c[a]me from behind me like they were going to pass me and hit me in my left front of my vehicle. . . . The other vehicle went off into the ditch and it knocked mine down the road." Rauschenberger testified that the car that hit him had been "going very fast, probably 60 something miles an hour." Kelly testified that, as he realized he was about to collide with the turning vehicle, he "basically just jerked the wheel to try to keep from rearending the other vehicle and go around the vehicle. And at the time that I did that, the best I can remember the vehicle turned into me, into my car. And it caused me to veer to the left and go through a guardrail and down into the ditch." Rauschenberger suffered a strained neck muscle from the collision and Kelly suffered cuts to his hands.

Following the collision, Kelly was taken to a nearby hospital. Meanwhile, Officer Fedincio Medina arrived on the scene of the accident. After spending about thirty minutes at the scene, Officer Medina went to the hospital to speak with Kelly. Officer Medina testified that, while speaking with Kelly, he noticed "an odor of alcohol type beverage on his person and also smelled an odor of marijuana, smell of marijuana on him." He testified that Kelly had told him he had had a couple of drinks. He further testified that he had then explained that he wanted to administer a field sobriety test and that Kelly had not cooperated in the administration of that test. Officer Medina testified that he had then "advised [Kelly] that [he] would be going to the magistrate's office to attempt to swear out a warrant against him for DUI." At that point, Officer Medina left the hospital and returned to the scene of the accident "to get the license of [Kelly] and do an inventory of the vehicle." Prior to leaving the hospital, he testified, he had told the nurses "that [he] would be returning back with warrants to attempt to get a blood alcohol drug screen on [Kelly]."

After he had returned to the scene of the accident, Officer Medina testified,

4

he encountered Kelly's father, Mr. Lewis. According to Officer Medina, Mr. Lewis approached him as he was conducting his inventory search of the vehicle and asked him what authority he had to be searching the car. By this time, Officer Medina had found a film canister in the car that contained "green plant material." This was later determined to be approximately one-half gram of marijuana. Officer Medina testified that he had told Mr. Lewis that he was the investigating officer and that he was going to go to the magistrate's office to attempt to obtain warrants against Kelly for DUI and possession of a controlled substance, and that "as soon as [he] got the warrant that [he] would be returning back to the hospital to place [Kelly] under arrest for any other charges that stemmed out of the investigation." He also testified that, after obtaining the warrants for Kelly's arrest, he had called the hospital and told Sandra Isenberger, one of the nurses there, to "tell the family that I was en route to the emergency room to serve the warrants on Patrick Kelly Lewis."

Mr. Lewis testified that, after receiving a phone call, he and his wife had gone to the hospital. While his wife remained with his son, he went to the accident scene. He denied that he had had any conversation with Officer Medina there. He testified that he had remained there long enough to see what was being done with Kelly's car and then returned to the hospital. He further testified that he never saw Officer Medina at the hospital, was never told by anyone at the hospital that he could not leave, and was never told by anyone that his son was under arrest.

Mrs. Lewis testified that, on the night in question, she never understood her son to be under arrest and that she never saw or spoke with Officer Medina. She testified that, after Kelly had been treated, "he asked the doctor if they were through. And the doctor said yes and he [Kelly] asked to go the restroom. He came back out, my

5

husband and I were standing there talking to the doctor. Kelly again asked if there was anything else. And the doctor said no." At that point, according to Mrs. Lewis, Kelly left to go wait for them in the car. After some more discussion with the doctor, she testified, she had suggested that her husband "go on out and check on Kelly." Her husband then left, she continued to speak to the doctor, and then she left and joined her son and husband in the car. They then left the hospital. Mrs. Lewis testified that no one ever told her she could not leave the hospital with her son.

Kelly testified that Officer Medina had not told him he was going to get warrants for him, did not tell him to stay at the hospital, and did not tell him he was going to be back later to talk to him. He further testified that, when he left the hospital to wait in the car, no one had told him to wait there for Officer Medina or that Officer Medina was on his way back to talk with him.

Susan Jenna Scarbrough was the charge nurse on duty on the night in question and assisted in treating Kelly. She testified that Kelly had been there approximately an hour before his parents arrived. She testified that Officer Medina had spoken to her technician, Renee, and that Renee had relayed their conversation to her. She testified that, based on what Renee had told her, she advised her supervisor, Sandra Isenberger, that "Trooper Medina had gone to get some warrants or something and he was on his way back." She also testified that she told Renee "to inform the family that Trooper Medina needed to discuss some further business about the wreck with them" and that, to her knowledge, Renee had done so.

Sandra Isenberger testified that Officer Medina had called the hospital and said "to keep [Kelly] there that he was on his way back, he needed to see them." She

further testified that, "At one point in time I told [Kelly and his parents] that Trooper Medina was coming back and wanted to talk to them." Renee did not testify. Officer Medina admitted that he had not placed Kelly under arrest at the hospital. He testified outside the presence of the jury that the defendants "later turned themselves in to the sheriff's office in Williamson County."

**ANALYSIS**

In their first issue, the defendants contend that the evidence was not sufficient to convict any of them of evading arrest. We agree.

When an accused challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Questions concerning the credibility of witnesses, the weight and value to be given to the evidence, as well as factual issues raised by the evidence are resolved by the trier of fact, not this Court. Cabbage, 571 S.W.2d 832, 835. A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

7

When the alleged offenses were committed, our criminal code provided that it was "unlawful for any person to intentionally flee from anyone the person knows to be a law enforcement officer and the person: (1) Knows the officer is attempting to arrest the person; or (2) Has been arrested." T.C.A. § 39-16-603(a) (Repl. 1991).[3] That is, a person could evade an arrest either while an officer was attempting to effect it, or after he or she had actually accomplished it. In this case, there is no dispute that Officer Medina had not yet placed Kelly under arrest as of the time he "fled." Accordingly, we need concern ourselves only with determining whether Kelly intentionally fled from Officer Medina while knowing that Officer Medina was attempting to arrest him.

The facts of this case establish that, at the time Kelly left the hospital, Officer Medina was on his way to attempt an arrest. He had not yet begun the attempt when the Lewis family left the hospital. In order to effectuate the arrest under the circumstances of this case, Officer Medina had to do two things: first, get an arrest warrant[4] and second, (attempt to) serve that warrant and place Kelly under arrest. As of the time Kelly left the hospital, Officer Medina had accomplished only the first step.

Thus, taking the evidence in the light most favorable to the State, Kelly and his father knew that Officer Medina was attempting to obtain a warrant for Kelly's arrest at the time they left the hospital. Attempting to obtain a warrant is not the equivalent of attempting to arrest someone. Officer Medina had not yet begun his attempt to arrest Kelly at the time the Lewis family left the hospital. Indeed, we are perplexed as to how any police officer could attempt to arrest someone when the officer is not in some

_____

[3]This statute has since been rewritten, effective July 1, 1995. See T.C.A. § 39-16-603 (Supp. 1995).

[4]Officer Medina testified that he had to obtain a warrant prior to arresting Kelly "for a violation of the law that wasn't committed in my presence on a misdemeanor type." See T.C.A. § 40-7-103.

8

physical proximity to the person he or she is attempting to arrest. Common sense dictates that, in order for an officer to arrest someone, he or she must be in a position to take physical custody of that someone <u>at that time</u>: not at some undetermined time in the future. Thus, the concept of fleeing from an officer necessarily involves the concept of fleeing <u>from the presence</u> of an officer. The State would have us hold that a police officer can effectuate an attempted arrest by telling someone to "sit right there until I get back with an arrest warrant." We decline to do so.[5] The convictions against Kelly Lewis, Patrick Lewis, and Donna Lewis for evading arrest are reversed and dismissed.

In light of our holding on the defendants' first issue, we find it unnecessary to address the defendants' issue concerning the trial court's supplemental instruction to the jury on the charges of evading arrest, and the issue concerning the constitutionality of the evading arrest statute.

Defendant Kelly Lewis next contends that the evidence was insufficient to support his conviction for felony reckless endangerment. Reckless endangerment is committed when a person "recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a) (Repl. 1991). Kelly argues that the State's proof established no more than that he had acted negligently when he rounded the curve and was unable to stop his car before colliding with the victim's vehicle. The State disagrees.

---

[5] If the State's position is correct, where would that leave Kelly Lewis had Officer Medina been unsuccessful in his quest for an arrest warrant? Would he be required to remain at the hospital until Officer Medina had gotten around to notifying him that he was now free to go? Kelly Lewis was either under arrest or he was not. If he was not, he was free to go unless Officer Medina was in the process of attempting to arrest him. Officer Medina had not reached that stage at the time Kelly left the hospital.

The conduct in which Kelly engaged was driving at a high rate of speed[6] at night after consuming two beers[7] into a curve beyond which lay an intersection he could not see. We think it obvious beyond the need to comment further that such conduct may place other drivers and/or passengers and/or pedestrians "in imminent danger of death or serious bodily injury." We need, then, determine only whether Kelly engaged in this conduct "recklessly."

A person drives recklessly when he "is aware of but consciously disregards a substantial and unjustifiable risk that" his driving may put others in imminent danger of death or serious injury. T.C.A. §§ 39-11-106(a)(31); 39-13-103. "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." T.C.A. § 39-11-106(a)(31).

The risk of putting others in imminent danger of death or serious bodily injury is, prima facie, "of such a nature and degree that its disregard constitutes a gross deviation from the standard of care." Moreover, the proof indicates that Kelly was driving so fast and under such circumstances that, when he finally saw Mr. Rauschenberger's vehicle, he was not only unable to stop, but even after colliding with the truck, went careening into a ditch across the road. This manner of driving, under all the circumstances, even as viewed from Kelly's standpoint, was a gross deviation from the

_____

[6]The only proof as to how fast Kelly was driving was the other driver's testimony that he had looked in his rearview mirror, began to turn and "the car come from behind me going very fast, probably 60 something miles an hour." In any event, the speed was too fast to allow Kelly to stop upon finding a car in his lane.

[7]Officer Medina testified that he had smelled the odor of marijuana about Kelly's person and in the interior of the car. Even taking this testimony at face value, it does not prove that Kelly was under the influence of marijuana at the time he was driving. For one thing, someone else could have smoked it in his car in his presence. Even if Kelly himself had smoked it, there is no proof in the record as to when he did so.

standard of care that an ordinary person would exercise.

Thus, the only remaining issue is whether Kelly was aware of the risk created by his driving but consciously disregarded it. We find that the proof, taken in a light most favorable to the State, supports the inference that Kelly was and did. His description of the collision at trial was as follows:

> Well, I remember coming down the hill, you come down the hill and go around a turn. And it was dark, there are not any lights around. And as I came around the turn there was another car's headlights in my eyes. And it was oncoming and I was having a very difficult time seeing. And I let off the gas to slow down and the other car passed me. And when it passed me, I realized that I was up on the rear end of another vehicle that was stopped in the middle of the road.
>
> And I basically just jerked the wheel to try to keep from rearending the other vehicle and go around the vehicle. And at the time that I did that, the best I can remember the vehicle turned into me, into my car. And it caused me to veer to the left and go through a guardrail and down into the ditch.

Kelly admitted that he had had two beers prior to commencing his drive. Thus, he was aware that he had consumed alcohol within a short time of getting behind the wheel of his car. As he approached the intersection at which the accident occurred, he knew it was dark and that he was coming down a hill and approaching a turn. Although he had a "very difficult time seeing" because of another car's headlights, his response is merely to "let off the gas." While this response was certainly too little, too late, it does indicate that Kelly knew he was driving too fast. Moreover, everyone who drives on the public roadways is aware that there is the ever-present possibility of other vehicles in front of you: whether you can see them or not. When driving down a hill and around a curve, blinded by oncoming headlights, it is particularly important to slow your speed so as to be able to stop if there is a vehicle ahead of you that you cannot yet see. Kelly did not do this. Even after taking his foot off the accelerator, he is still doing "60 something" miles an hour when he veers around Mr. Raushenberger's truck.

11

We are sympathetic to the defendant's plea that "[e]very automobile accident should not be transformed into a reckless endangerment prosecution." However, the collision which occurred in this case is not typical of "every automobile accident." Rather, the collision in this case is typical of automobile accidents in which one or more of the drivers is driving recklessly. It is certainly negligent to drive at such a speed that you cannot stop in time to avoid hitting a car in your lane attempting to make a legal left turn. It is far more than negligent -- it is reckless -- to do so at night, as you are approaching a blind curve, and after you have had a couple of drinks.

In State v. Ramsey, 903 S.W.2d 709 (Tenn. Crim. App. 1995), this Court considered a defendant who had been speeding and, as his car entered a right turn, drifted into the oncoming lane, hitting a pick-up truck. The collision killed the passenger in the defendant's car. There was no evidence that the defendant had been under the influence of any alcohol or drugs. Based on the high rate of speed and the curvy, hilly conditions of the road, this Court found that the defendant had operated his vehicle in a reckless manner so as to be guilty of reckless endangerment. Similarly, in State v. Clifford Bidwell, No. 03C01-9308-CR-00287, Bradley County (Tenn. Crim. App. filed Aug. 30, 1994, at Knoxville), this Court affirmed a conviction of reckless endangerment where the defendant, with a police officer in pursuit, "drove his automobile at a high rate of speed in a congested area through several stop signs and through a police roadblock." Although no one was hurt as a result of the defendant's actions, this Court found that the evidence was "overwhelming."

This issue is without merit.

The defendant Kelly next contends that the trial court erred because it did

not instruct the jury on the lesser offense of misdemeanor reckless endangerment. We first note that trial judges must instruct the jury on all lesser offenses where there is any evidence to support them, State v. Wright, 618 S.W.2d 310, 315 (Tenn. Crim. App. 1981), but "where the record clearly shows that the defendant was guilty of the greater offense and is devoid of any evidence permitting an inference of guilt of the lesser offense, it is not error to fail to charge on a lesser offense." State v. Boyd, 797 S.W.2d 589, 593 (Tenn. 1990).

Reckless endangerment is a Class A misdemeanor unless it is committed with a deadly weapon, whereupon it is a Class E felony. T.C.A. § 39-13-103(b). There is no evidence whatsoever that Kelly committed reckless endangerment other than by driving his car in a reckless manner. A deadly weapon is defined as "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." T.C.A. §39-11-106(a)(5)(B) (emphasis added). As we have previously discussed, the proof established that Kelly drove his automobile in a manner which was quite capable of causing death or serious bodily injury. Indeed, with respect to the proof about how the wreck occurred, there is no proof in the record that he drove his car in any other manner. Therefore, it is immaterial that we have previously recognized that automobiles are not, under all circumstances, deadly weapons. See State v. Scott W. Long, No. 03C01-9301-CR-00032, Greene County (Tenn. Crim. App. filed Aug. 19, 1993, at Knoxville). Under the circumstances of this case, the defendant Kelly's method of driving his car rendered it a deadly weapon. There being no proof in the record that Kelly committed the offense of reckless endangerment in any other way, no instruction on misdemeanor reckless endangerment was required. Only when there is some evidence upon which reasonable minds could convict the defendant of a particular lesser offense is the court required to instruct regarding that offense. Johnson v. State, 531 S.W.2d

13

558, 559 (Tenn. 1975). This issue is without merit.

The defendant Kelly's next three issues challenge the propriety of his sentences. We will first address his contention that the trial court abused its discretion in failing to sentence him to judicial diversion for the misdemeanor offense of possession of marijuana. Because Kelly has not been previously convicted of a felony and because this offense is a Class A misdemeanor, he is eligible for judicial diversion on this offense. T.C.A. § 40-35-313(a)(1). His concurrent conviction for felony reckless endangerment does not prohibit the granting of judicial diversion. See State v. Eric Lemart Harris, No. 03C01-9511-CC-00363, Washington County (Tenn. Crim. App. filed Dec. 30, 1996, at Knoxville).

> This Court has previously held that
>
> judicial diversion is similar in purpose to pretrial diversion and is to be imposed within the discretion of the trial court subject only to the same constraints applicable to prosecutors in applying pretrial diversion under T.C.A. § 40-15-105. Therefore, upon review, if ⊲any substantial evidence to support the refusal' exists in the record, we will give the trial court the benefit of its discretion. Only an abuse of that discretion will allow us to overturn the trial court.

State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992) (citation omitted). And, in making its determination of whether to grant judicial diversion, the trial court must consider all of the following factors:

> (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the status of the accused's physical and mental health, and (f) the deterrence value to the accused as well as others. The trial court should also consider whether judicial diversion will serve the ends of justice -- the interests of the public as well as the accused.

State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993) (citation omitted). Additional factors to be considered are Kelly's attitude, his behavior since arrest, his

14

home environment, current drug usage, emotional stability, past employment, general reputation, family responsibilities, and the attitude of law enforcement. See State v. Washington, 866 S.W.2d 950, 951 (Tenn. 1993).

In this case, the trial court first denied judicial diversion to Mr. and Mrs. Lewis on their convictions for evading arrest. In doing so, the court cited as reasons that (a) the defendants had not taken full responsibility for committing the offenses; (b) the nature of the crimes ("It is the kind of offense when one attempts to interfere or to evade an officer attempting to do their duties for which persons must be held accountable"); and (c) judicial diversion would not serve the public's interest and would depreciate the seriousness of the offenses. The trial court further stated that it considered judicial diversion to be "reserved for those who fully understand and accept the nature of the facts [sic] that they have committed." In then turning to Kelly's request for judicial diversion, the court stated, "I do not find it's appropriate in [Kelly's] case to grant diversion . . . for many of the reasons I have just recited and in addition, [Kelly] was the primar[y] actor in this case." The court went on to state, "I think there's a great deal more responsibility that has to be accepted in this case. . . . These are serious [charges], they must not be depreciated and society must be protected[.]"

In this case, the court below made no specific findings as to Kelly's amenability to correction. As to the circumstances of the offenses, the court noted only that Kelly was the "primar[y] actor in this case." This observation was relevant only with respect to the evading arrest convictions, however. There were no other "actors" in the possession and endangerment crimes. It was undisputed that Kelly had no criminal record. As to his social history, the court found that he had a "stable prior home life, full work history, participation in civic activities, and other productive participation in the

15

system." In the presentence report, Kelly's descriptions of his physical and mental health were "excellent" and "good," respectively. Although he had admitted at trial to having twice tried marijuana in college (Kelly was twenty-nine years old at sentencing), he denied current use of it as well as any other illegal drug and reported no substance abuse problem involving alcohol. The court made no specific findings with respect to the deterrence value of denying judicial diversion on this charge. As to whether diversion would serve the ends of justice, the court stated only that the charges were serious, must not be depreciated, and society must be protected.

Because the trial court failed to consider all of the factors appropriate to the grant or denial of judicial diversion, and because its statement of the reasons for denial is vague and conclusory, we find the record inadequate to allow appropriate appellate review. Accordingly, we remand this matter for further proceedings in order for the court below to reconsider Kelly's request for judicial diversion on the simple possession offense. We further point out that the amount of marijuana found in Kelly's car was minute. Therefore, the "seriousness" of this particular charge is questionable. As for Kelly's refusal to accept responsibility for this particular offense, we agree with the defendant that his continued denial of guilt should not, in and of itself, preclude judicial diversion. "An admission of guilt is not a valid prerequisite to the granting of . . . diversion." State v. Trevis Maynard, No. 01C01-9303-CC-00086, Rutherford County (Tenn. Crim. App. filed Feb. 24, 1994, at Nashville). Kelly denied that the marijuana was his at his trial: that the jury found him guilty does not, ipso facto, prove that he was lying and does not, ipso facto, prove that he is not amenable to correction.

Kelly also complains that the fine imposed for the simple possession charge is excessive. The maximum fine for the marijuana charge is $2,500, T.C.A.

16

§ 40-35-111(e)(1), and the defendant was fined $2,000. This was the fine assessed by the jury and then imposed without further comment by the trial court.

In imposing defendant Kelly's sentences, the trial court found multiple mitigating factors and no enhancement factors. Fines, like the length and manner and service, are to be "based upon the factors provided by the 1989 Sentencing Act, which include ‹the defendant's ability to pay that fine, and other factors of judgment involved in setting the total sentence.'" State v. Marshall, 870 S.W.2d 532, 542 (Tenn. Crim. App. 1993). It appears to us that Kelly's fine should reflect the same minimalist approach that the other portions of his sentences do. Accordingly, we remand the issue of Kelly's fine for the simple possession charge for reconsideration by the trial court in light of all appropriate sentencing factors.

Finally, defendant Kelly contests the "consecutive" nature of his fines. In addition to the $2,000 fine for the marijuana charge, Kelly was fined the maximum of $3,000 for the reckless endangerment offense. Although his sentences were run concurrently, the sentencing court denied his post-trial motion that the fines be run concurrently. Kelly argues that the trial court's decision was error and urges this Court to reconsider its decision on this issue in State v. Woodcock, 922 S.W.2d 904 (Tenn. Crim. App. 1995).

In Woodcock, this Court considered a defendant who had been convicted of and sentenced for multiple offenses. The trial court ordered the sentences to run concurrently. The issue on appeal was whether the fines imposed in conjunction with the sentences also ran concurrently. We held that "the trial court's imposition of concurrent ‹sentences' under T.C.A. § 40-35-115 refers only to the defendant's terms of

17

imprisonment and does not imply that fines are to be paid concurrently, or non-cumulatively, as well. . . . [U]nder our interpretation of the language of T.C.A. § 40-35-115, any reference to concurrent <u>sentences</u> alone does not include concurrent fines by implication." <u>Woodcock</u>, 922 S.W.2d at 918 (emphasis in original). We continue to abide by our holding in that case. The court below declined to run the fines concurrently and did not err by so doing. This issue is without merit.

In summary, we reverse and dismiss the convictions for evading arrest entered against Donna Lewis, Patrick K. Lewis, and Patrick Kelly Lewis II. We remand for further proceedings in accordance with this opinion consideration of Patrick Kelly Lewis II's request for judicial diversion on his conviction for simple possession of marijuana. We further set aside the lower court's fine of $2,000 against Patrick Kelly Lewis II on the possession charge and remand for further proceedings on the amount of the fine in accordance with this opinion. In all other respects, the judgments below are affirmed.

_____
JOHN H. PEAY, Judge

CONCUR:

_____
WILLIAM M. BARKER, Judge

_____
JERRY L. SMITH, Judge