IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 29, 2005 Session

## STATE OF TENNESSEE v. ADAM DEWEY HOUSEHOLDER

**Direct Appeal from the Circuit Court for Blount County**
**No. C-14850     D. Kelly Thomas, Jr., Judge**

_____

**No. E2004-01969-CCA-R3-CD  Filed September 29, 2005**

_____

The appellant, Adam Dewey Householder, pled guilty to theft over $10,000, a Class C felony.  He received a four year sentence, with nine months to be served in the county jail and the remainder on supervised probation.  In addition, he was ordered to pay $26,820.00 in restitution.  On appeal, he argues that the trial court erred in denying judicial diversion and in ordering a sentence of split confinement.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined.  JAMES CURWOOD WITT, JR., J., not participating.

Julie A. Rice, Knoxville, Tennessee (on appeal), and Craig Garrett, Maryville, Tennessee (at trial), for the appellant, Adam Dewey Householder.

Paul G. Summers, Attorney General and Reporter; Blind Akrawi, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Rocky H. Young, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I.  Factual Background

According to the affidavit of complaint in this matter, the appellant, while employed as a finance manager at West Chevrolet, Inc. ("West") in Alcoa, took approximately $36,919.82 from his employer between July and September 2002.  He was subsequently indicted for theft over $10,000 and pled guilty to the same on June 11, 2004, with the length and manner of service of the sentence to be determined by the trial court.

At the sentencing hearing, the thirty-two-year-old appellant testified that he was married, had two young sons, and was working for a trucking company owned by his brother, earning $600

weekly. He said he had never been convicted of any crime prior to the instant offense. He was employed by West from January 1998 to October 2002, earning $80,000 to $85,000 annually. He acknowledged that after he learned in mid-2001 that his sister was ill with cancer and could no longer work, he began taking money and vehicles from West. His sister had been renting a mobile home in Seymour that he owned, but she was unable to pay rent after she became sick. The appellant said he made the $420 monthly payments on the mobile home, as well as the monthly payments on his $300,000 home in Maryville. Additionally, he bought his sister groceries and supplied her with a 1990 Buick LeSabre vehicle, valued between $2500 and $3000. He explained that he completed the paperwork on the automobile for his sister but "covered up the fact that it wasn't being paid for." In March 2003, the appellant received a letter from his sister, thanking him for all of his help. She passed away in August 2003.

During this same period of time in 2001, the appellant's father underwent bypass surgery after suffering a heart attack, and he was diagnosed with diabetes and Alzheimer's. As a result of these illnesses, the appellant's parents experienced financial problems. Additionally, their vehicle was totaled after an accident. The appellant admitted that he took two vehicles, a 1991 Chevrolet Corsica and a 1988 Ford Crown Victoria, valued at $3000 and $2000, respectively, from West for his parents in the same manner as he had done for his sister. He also admitted taking approximately $28,000 in cash from his employer during 2001 and 2002.

The appellant acknowledged that a detective confronted him about his wrongdoing, and, shortly thereafter, he signed a document admitting that he took money from West. He said West agreed to give him one year to repay the money. On October 15, 2002, he signed a document, agreeing to pay $36,919.82 in full to West by October 1, 2003. The appellant said he paid approximately $9,100 during that year, explaining that "[w]e had obligations with the family. And my personal obligations, we were . . . just so far behind, so . . . hard-strapped to do any more than that." In addition to the $9,100, the appellant said he had made two $500 payments to West's insurance company after West turned the matter over to the company, and he had signed a note with the insurance company as well. However, he said he could no longer make the $500 payments because he had changed jobs. Therefore, he was trying to "renegotiate that figure to a lesser amount." He said he could "[a]bsolutely" complete any term of probation the court imposed.

On cross-examination, the appellant said that his mortgage company had foreclosed on his $300,000 house in the latter part of 2002. Thereafter, the appellant moved from Knoxville to Blount County and began paying $975 in rent per month. The appellant testified that his wife was employed and earned about $24,000 annually. He acknowledged that within a month of losing his job at West, he began working at Reeder Chevrolet ("Reeder"), earning $85,000 the first year. He was employed by Reeder for about a year and a half before losing that job as well. While employed at Reeder, the appellant purchased three vehicles, a 2004 Volkswagen priced at $25,000, a 2001 Mustang priced at $11,800, and a 1970 Chevelle priced at $15,500. When questioned whether the vehicles had been repossessed, the appellant replied, "Those have all been taken back and through me talking to the finance company, those vehicles have been sold."

Scarlett Householder, the appellant's wife, testified that she worked at a preschool, earning between $22,000 and $24,000 annually. She said she did not know the appellant had taken money from West until "the day that he told me he had to go take a lie detector test." She stated the appellant always paid their bills and took care of their finances. She acknowledged that she and the appellant had helped his sister financially after she became ill. She described the appellant as "a very good dad" and "a good husband." She maintained that she needed the appellant at home to help with their children. She said the appellant had learned from this situation, and she did not believe that he would ever steal again. She believed that he could successfully complete probation.

The appellant's mother, Ruth Householder, testified that her husband suffered a heart attack in 2001 and underwent bypass surgery. In addition, he was diagnosed with diabetes and early Alzheimer's. Her husband retired in 1997. He began drawing social security benefits in 1998, receiving $1,003 per month in social security benefits. She said she received social security benefits in the amount of $506 per month; however, she did not receive social security benefits in 2001 or 2002. She explained that she worked from late May to December as "a seasonal worker," working thirty to thirty-two hours weekly and earning $8.30 per hour. She acknowledged that the appellant had helped her and her husband financially in 2001 and 2002 but said she had no idea how he got the money he gave them. The appellant also "[h]elped with" two vehicles. She did not learn that the appellant had stolen from West until he was terminated. She described the appellant as a "perfect" son and said she never had any problems with him.

According to the victim impact statement completed by Steve West, President of West Chevrolet, the appellant earned in excess of $80,000 annually during the last two years of his employment with West. Mr. West said he fired the appellant "for stealing but gave him one year to pay the money back and avoid prosecution." He also helped the appellant "get another comparable job without mentioning his theft." Mr. West opined that the appellant's "lack of remorse and misuse of the opportunity to repay without prosecution should result in more penalty than plain restitution and parole. Not only does he need to learn a lesson, but as an example to other employees, he needs significant confinement."

At the conclusion of the hearing, the trial court sentenced the appellant as a Range I standard offender to four years, with nine months to be served in confinement and the balance on probation. Additionally, the court ordered the appellant to pay $26,820 in restitution at the rate of $500 per month.

## I. Analysis

### A. Judicial Diversion

The appellant argues that the trial court abused its discretion in denying judicial diversion because the court did not consider all of the required factors in making its decision. Specifically, he contends that he has proven himself amenable to rehabilitation by immediately taking responsibility for his crime; that both he and his wife have "made positive changes to their lifestyle reflecting the

serious nature of the debts which must be repaid to West and to society"; that he has "shown remorse for the breach of his former employer's trust and sought forgiveness from Mr. West personally"; and that he has no prior criminal record, does not abuse alcohol or drugs, and has remained gainfully employed.

A defendant is eligible for judicial diversion when he or she is found guilty or pleads guilty to a Class C, D, or E felony and has not previously been convicted of a felony or a Class A misdemeanor. See Tenn. Code Ann. § 40-35-313(a)(1)(B) (2003). It is within the trial court's discretion to grant or deny judicial diversion. See State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). As such, the trial court's decision will be overturned only if the court abused its discretion. Id. In other words, we will not interfere with the denial of judicial diversion if the record contains any substantial evidence to support the trial court's refusal to grant diversion. Id. Moreover, we observe that "judicial diversion is similar in purpose to pretrial diversion and is to be imposed within the discretion of the trial court subject only to the same constraints applicable to prosecutors in applying pretrial diversion under [Tennessee Code Annotated section] 40-15-105." State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992).

In determining whether to grant a defendant judicial diversion, the trial court must consider all of the following factors: (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the status of the defendant's physical and mental health, and (6) the deterrence value to the defendant and others. State v. Lewis, 978 S.W.2d 558, 566 (Tenn. Crim. App. 1997). "The trial court should also consider whether judicial diversion will serve the ends of justice--the interests of the public as well as the accused." Id. The record must reflect that the trial court has taken all of the factors into consideration. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). Furthermore, "the court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others." Id.

At the sentencing hearing, the trial court concluded:

> I have looked at the fact that you don't have a record, your age, and all those kinds of things. I've looked at the amount of restitution that you've paid. I've considered that. I've tried to evaluate what my take is, based on the evidence, of the likelihood of your rehabilitation. I don't think the likelihood of your committing future crimes is large; but at the same time, I don't think either you or your wife – and what she really understands or doesn't is irrelevant as far as this sentencing goes, but it's the same attitude. I'm just shocked that a person who had embezzled $36,000, or whatever the original amount was, and was to pay restitution within a year and didn't pay but $9,000, a fourth of it, would come into a sentencing hearing and start talking about buying $25,000 automobiles and renting a house that's a

-4-

thousand dollars a month. That's – you've got a lot of the same attitude left that got you in this problem in the first place. . . .

At any rate, it's best illustrated by how, when you were asked how you could afford a thousand-dollar-a-month house and you said you would have to make some adjustments in your expenses and the thing that you were going to adjust was to negotiate the restitution payment down from $500. That's the best illustration that I can come up with of the problem that you're still having with your attitude about this.

It is clear that the trial court considered all relevant factors, concluding that the appellant's continued lavish lifestyle, resulting in his paying little of the agreed-upon restitution, was evidence of his unwillingness to accept responsibility for his crime. The record amply supports this determination as well as the denial of diversion.

## B. Full Probation

The appellant contends the trial court erred in ordering him to serve nine months in confinement, arguing that "his case is similar to another one out of the same judicial district wherein the same Trial Court imposed a 90-day sentence of incarceration on someone who embezzled almost twice as much money over a much longer period of time," citing State v. Elizabeth M. Clark, No. E2002-01592-CCA-R3-CD, 2003 WL 22843171 (Tenn. Crim. App. At Knoxville, Dec. 1, 2003), perm. to appeal denied, (Tenn. 2004).

A defendant is eligible for probation if the sentence received by the defendant is eight years or less, subject to some statutory exclusions. Tenn. Code Ann.§ 40-35-303(a) (2003). An especially mitigated or standard offender convicted of a Class C felony is presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(6) (2003). However, although a defendant may be presumed to be a favorable candidate for alternative sentencing, the defendant has the burden of establishing suitability for total probation. Tenn. Code Ann. § 40-35-303(b); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). Even though probation must be automatically considered, "the defendant is not automatically entitled to probation as a matter of law." Tenn. Code Ann. § 40-35-303(b), Sentencing Commission Comments; see also State v. Hartley, 818 S.W.2d 370, 373 (Tenn. Crim. App. 1991). A defendant seeking full probation bears the burden on appeal of showing the sentence imposed is improper, and that full probation will be in the best interest of the defendant and the public. State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997). In determining suitability for total probation, the trial court may properly consider credibility, remorse, and candor as they reflect upon potential for rehabilitation. See Tenn. Code Ann. § 40-35-103(5) (2003); State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983); State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999).

Under the 1989 Sentencing Act, sentences which involve confinement are to be based on the following considerations contained in Tennessee Code Annotated section 40-35-103(1):

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

See State v. Grigsby, 957 S.W.2d 541, 545 (Tenn. Crim. App. 1997); State v. Millsaps, 920 S.W.2d 267, 270 (Tenn. Crim. App. 1995).

In ordering the appellant to serve nine months in jail, the trial court considered the fact that "a lack of any jail time would depreciate the seriousness of this offense" and stated:

> You're being sent to jail because you didn't figure out within that year that you had to sacrifice and totally change your way of living and doing things to pay as much of that [restitution] as you possibly could. And you didn't do that, and still haven't decided that. And I don't say that being mean or anything. That's just – you look at what's happened here and what you're doing and that's just a fact.

We do not accept the appellant's argument that a trial court's sentencing of a defendant establishes a ceiling for sentencing in similar crimes. In this matter, it is clear that the appellant opted for a continued lifestyle over paying restitution to his victim. The record supports the trial court's sentencing of the appellant.

### III. Conclusion

We conclude that the trial court did not err in denying the appellant's request for judicial diversion nor in imposing a sentence of split confinement. Therefore, we affirm the judgment of the trial court.

_____

NORMA McGEE OGLE, JUDGE

-6-