# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### April 20, 2010 Session

## STATE OF TENNESSEE v. JOCELYN D. MIMS

**Appeal from the Criminal Court for Sumner County**
**No. 288-2008     David Patterson, Judge**

---

**No. M2009-00512-CCA-R3-CD - Filed July 27, 2010**

---

The Defendant, Jocelyn D. Mims, pleaded guilty to one count of conspiracy to introduce contraband into a penal institution and one count of attempted introduction of contraband into a penal institution, Class D felonies.  She received concurrent terms of two years as a Range I, standard offender for these convictions.  After a sentencing hearing, the trial court denied the Defendant's request for judicial diversion.  She challenges that ruling on appeal. After a review of the record, we affirm the judgments of the Sumner County Criminal Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

David L. Raybin, Nashville, Tennessee, for the appellant, Jocelyn D. Mims.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; and Lawrence Ray Whitley, District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

A Sumner County grand jury returned a five-count[1] indictment against the Defendant, charging her with one count of conspiracy to introduce contraband into a penal institution, one count of possession of a Schedule IV controlled substance with intent to deliver, one count of simple possession of marijuana, and two counts of attempted introduction of

---

[1]  The counts in the indictment appear to be incorrectly numbered, failing to include a count two.

contraband into a penal institution. On November 21, 2008, the Defendant entered a guilty plea to one count of conspiracy to introduce contraband into a penal institution and one count of attempted introduction of contraband into a penal institution. See Tenn. Code Ann. § 39-16-201.

At the guilty plea hearing, the State provided a factual basis for the plea. The prosecutor recited the events as follows:

> In the previous case for which Mr. Porter is now serving time in the Department of Correction, his attorney was [the Defendant]. And he pleaded guilty on the charge and is serving time on January the 10th of 2008. He went into custody in the Sumner County Jail on January the 11th of 2008.
>
> After that time, [the Defendant] and Mr. Porter continued to have conversations, some on the telephone, some on contact visits, some on visits—at the attorney visiting area.
>
> Things were going along smoothly until about the 13th day of February wherein there was mounting suspicion as to the activities of [the Defendant] by jail personnel, one of which was that [the Defendant] had brought during an attorney—supposed attorney/client visit, she had brought Mr. Porter's eight-year-old daughter to the visit or to the conversation, and she was present in the jail outside of visiting hours.
>
> Shortly after that, Mr. Porter was found with tobacco in his shoe. He had been accepted into the Homeward Bound Program, which is a very good program which Sumner County has here in the jail, and he was dismissed from that program because it was a violation to have the tobacco.
>
> At about that same time, [the Defendant] called Tim S[i]rcy, who is not a county employee, but is a liaison between the jail and jail inmates and Cumberland Mental Health, and she had told Mr. S[i]rcy that she was concerned about Mr. Porter's mental health and that he needed some medication and that he was banging his head against the wall and things of this nature. And she also disclosed that she was madly in love with Mr. Porter. That caused some concern.
>
> Mr. S[i]rcy told jail personnel, Sonya Troutt, who is the jail administrator. Sonya Troutt came to Major Don Linzy, who is the chief of detectives of Sumner County. And Major Linzy launched an investigation at

that point because of these matters and other matters that had cast some suspicion on the relationship between the two defendants . . . .

So Major Linzy assigned Detective Tim Bailey, who is in the courtroom here today, to the case. And Detective Bailey pulled the jail conversations relating—he got all the conversations wherein Mr. Porter had called [the Defendant's] cell phone and her home phone, and those were very revealing conversations.

Each one of those conversations, which are administered by Global Tel*Link, had the admonition at the very beginning of each conversation that these conversations were being taped and were subject to being listened to, but, nevertheless, the two parties continued talking.

And it was apparent from the get-go that this was something more than an attorney/client relationship, that there was a romantic relationship there, and it was clear that they were discussing getting drugs in to Mr. Porter.

These conversations continued to develop to the point where it was clear that [the Defendant] had given Mr. Porter some Xanax. As a matter of fact, she had told Mr. S[i]rcy, Tim S[i]rcy, that she had given him Xanax from her own prescription before he went into the jail. But then it became apparent that she had given him Xanax while he was in jail, too. She had smuggled those Xanax in to him.

The conversations continued to the point where Mr. Porter had arranged with [the Defendant] for [the Defendant] to have a drop-off point for some marijuana and for Xanax and perhaps other drugs over in the LaGuardo Community, which is right across the bridge at 109. . . .

And [the Defendant] did in fact drop off—I believe it was a Wendy's cup that had marijuana in it, had tobacco in it, which is contraband in the jail, it's not allowed in the jail, and had fifty-eight Xanax. I think there were eight Xanax bars, and then the rest were Xanax tablets, which is Alprozolam, a schedule IV controlled substance. That cup was confiscated by Detective Bailey.

Detective Bailey took the marijuana out and took the drugs out, left the tobacco in, and put it in another cup. And then by other taped conversations, we knew that Jeff Satterfield, which is another inmate here in the Sumner

County Jail, working in concert with Mr. Porter and [the Defendant], came by on his way on a furlough to Wilson County to pick up the cup. And so his father-in-law picked up the cup. Mr. Satterfield was arrested or stopped there with the cup that had the tobacco in it because Detective Bailey did not want to risk anybody getting their hands on the marijuana and the Xanax.

The cup was treated for fingerprints. Prints were lifted by Officer Don Badacour, and sent down to the lab, and the thumb print on this Wendy's cup wherein the Xanax, the marijuana, and the tobacco were concealed—the thumb print came back to the [D]efendant . . . . So at that point [the Defendant] was arrested. There was a controlled conversation between Jeff Satterfield, the inmate, and [the Defendant] where there was incriminating information imparted there.

The whole thing is, there was—the attorney/client relationship had developed into a romantic relationship, which developed into [the Defendant] smuggling drugs into the jail to Mr. Porter.

Pursuant to the terms of the plea agreement, the Defendant, a Range I, standard offender, received a sentence of two years at 30% for each offense, which sentences were to be served concurrently with one another. The manner of service of the sentence, including the availability of judicial diversion, was submitted to the trial court for determination.

A hearing was held on January 29, 2009. The State offered the presentence report into evidence. The report shows that the fifty-year-old Defendant did not have a prior criminal record other than three speeding tickets. She was married but separated from her husband. In 2004, she graduated with a juris doctorate degree from Vanderbilt University Law School. She reported employment with the Legal Aid Society of Middle Tennessee in 2003 and with a law firm, Byrd & Associates, PLC from August 2004 to February 2006. After February of 2006, she was self-employed. The Defendant surrendered her law license at the guilty plea hearing.

In the report, the Defendant described her drug usage. She admitted to using non-prescribed and illegal drugs: marijuana usage from the age of sixteen until she was forty-nine; cocaine usage from the age of twenty-four until she was thirty-six; LSD usage from the age of seventeen until she was nineteen; and mushroom usage while she was eighteen. According to the Defendant, she was not using illegal drugs at the time of the sentencing hearing. The Defendant also reported that her mental health was fair, stating that she suffered from depression, anxiety, ADD, bipolar disorder, and personality disorder. She was undergoing psychiatric treatment and took several medications to treat her conditions. The

-4-

Defendant also provided an eighteen-page personal statement detailing her involvement in the drug smuggling.

Following the introduction of the presentence report, the State called Detective Tim Bailey to testify about his investigation of the case. Detective Bailey also testified that the smuggling of drugs into the Sumner County jail was an "ongoing problem." In her defense, the Defendant called her personal physician, Dr. Lori Ray, and her psychologist, Dr. Robert Jacobs, who detailed the Defendant's mental health history. Then, the Defendant's father and the Defendant testified.

At the conclusion of the hearing, the trial court denied the Defendant's request for judicial diversion and alternative sentencing. The Defendant now appeals from this judgment contending as error the denial of judicial diversion.[2]

## Analysis

The Defendant argues that the trial court erred by denying judicial diversion. Specifically, she argues that the trial court did not "properly weigh the relevant factors, improperly assign[ed] controlling weight to the circumstances of the offense, and fail[ed] to consider the interest to the public and the ends of justice when all other criteria supported diversion."

"Judicial diversion is a legislative largess whereby a defendant adjudicated guilty may, upon successful completion of a diversion program, receive an expungement from all 'official records' any recordation relating to 'arrest, indictment or information, trial, finding of guilty, and dismissal and discharge' pursuant to the diversion statute." State v. Schindler, 986 S.W.2d 209, 211 (Tenn. 1999). The effect of discharge and dismissal under the diversion statute "is to restore the person . . . to the status the person occupied before such arrest or indictment or information." Id. (citing Tenn. Code Ann. § 40-35-313(b) (1997)).

A criminal defendant is eligible for judicial diversion only if she has been convicted of a misdemeanor or a class C, D, or E felony and has not been previously convicted of a felony or a Class A misdemeanor. Tenn. Code Ann. § 40-35-313(a)(1)(A). However, eligibility under the diversion statute does not ensure the grant of diversion. Indeed, the decision of whether to place a defendant on judicial diversion is within the sound discretion of the trial court. State v. Harris, 953 S.W.2d 701, 705 (Tenn. Crim. App. 1996). Thus, upon review by an appellate court, if "any substantial evidence [exists in the record] to support the

_____

[2] The Defendant has completed serving her sentence.

refusal," the decision of the trial court will be upheld and this court will not revisit the issue. State v. Hammersley, 650 S.W.2d 352, 356 (Tenn. 1983).[3]

In making the determination of whether to grant judicial diversion, the trial court must consider the following factors: (a) the accused's amenability to correction; (b) the circumstances of the offense; (c) the accused's criminal record; (d) the accused's social history; (e) the status of the accused's physical and mental health; and (f) the deterrence value to the accused as well as others. State v. Lewis, 978 S.W.2d 558, 566 (Tenn. Crim. App. 1997) (citing State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993)). The trial court should also consider whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused. Id. Additional factors which may be considered include a defendant's attitude, behavior since arrest, home environment, current drug usage, emotional stability, past employment, general reputation, family responsibilities, and the attitude of law enforcement. Id. (citing State v. Washington, 866 S.W.2d 950, 951 (Tenn. 1993)).

At the outset of its sentencing ruling, the trial court stated that it would look to the following factors in making its determination as to whether to grant judicial diversion or probation:

> The [D]efendant's amenability to correction, No. 1; the circumstances of the offense, No. 2; the [D]efendant's record or lack thereof, No. 3; the [D]efendant's social history, No. 4; No. 5 the [D]efendant's physical and mental health, and, No. 6 the deterrent value as to the [D]efendant as well to other, the public at large.

The trial court then made extensive findings and conclusions regarding these factors:

1. Amenability to correction

> And the [c]ourt considers the [D]efendant's amenability to correction. As I review this 18-page attachment written by the [D]efendant, I don't find any statement in this that indicates that the [D]efendant believes she's responsible for her crimes. She wrote 18 pages. This [c]ourt is well aware of other very short statements made by defendants in presentence reports. They may be three sentences long. "I am so sorry. I will pay everyone back. This

---

[3] The Defendant argues that we should apply a de novo standard of review rather than an abuse of discretion standard. However, the jurisprudence in this State on the appropriate standard of review is unequivocal, and we decline to delineate from the case law.

-6-

will never happen again." The [c]ourt has heard the testimony today, and the [c]ourt has head the [D]efendant say those very things.

But throughout the detailing in this 18-page document, the events of her life and the incidents charged leading up to these charges, she continually minimizes her accountability. And even today she doesn't remember the sexual encounters, although she's able to remember that she bumped her head and that [Porter] said something about her being beautiful and that she woke up naked.

I have heard a detailed account detailing not only the answers to the questions asked but every other detail of her life from the time that she began school at 16 in college, but I haven't heard a thing about the sexual encounter, though the [c]ourt is not all that interested in hearing of the sexual encounter.

I also heard today for the first time, contrary to this report, that the Xanax wasn't given to [Porter], but it was taken from the glove box. We can begin with page 14 of the attachment, and the State has presented some cross-examination. "This case and this man tugged at my heart more than I should have allowed. It was so unfair the way he was being treated. I was asked to supply tobacco, but primarily what I wanted to get Richard was the Xanax to help him stay clam and get some sleep." She minimizes her own accountability in the next paragraph by saying, "I was given instructions designed by Mr. Satterfield." This is a Vanderbilt graduate who has gained several legal certificates and other things along the way.

Page 15, "Now, as to how I feel about all this I have described, at the time I felt very uncomfortable. I also felt very desperate to help a man about whom I cared deeply for who nothing was being done to give him mental health treatment and medication he needs. I admit that my personal feelings got in the way of my professional responsibility. My whole life was in crisis," it says later, "my personal life, my professional life, everything. I was overwhelmed at home. I was overwhelmed at work. I was in a lot of physical and emotional pain. I still am."

The [c]ourt made some notations as testimony came today from the [D]efendant, and one of the notations that the court made, I wrote these words, "me, me, me." And a lot of the testimony today from the [D]efendant was what people have done or not done for me; a husband, professor, grades that were given or not given. I was successful. There was a lot of stress. My

husband was my problem. And at this time, this [c]ourt believes that the [D]efendant has not really taken accountability or is not responsible yet for the activity that she has precipitated, that has fallen upon her, and that are the crimes for which this [c]ourt is sentencing her.

Mr. Porter, the testimony today was when he pled, it was to get mental health treatment. "My other client said he was ill and going to hurt himself. The jail refused to medicate him. I was desperate. Tim Sircy was one of the problems. I don't subscribe to situational ethics," was the testimony of the [D]efendant today, "but what I tried to do that was right did not work," justifying her activity today for what she did that was wrong.

The [D]efendant's attorney asked how was the mother involved, what did the mother ask you to do. The State said that that was irrelevant. But to this [c]ourt it's very relevant, because what the [D]efendant answered was, "The mother asked me to help him get sleeping pills. She begged me to bring pills to her son." It's the mother's fault. "I have waited to talk 11 months, but I could only talk with the doctors. I don't know where to start." She goes on to say, "I'm sorry I did it."

We heard that today, that she's sorry she did it, but there's an 18-page attachment here, and there is every indication to this [c]ourt that this person has not yet taken accountability, has not yet taken responsibility for the actions that not only involved her but involved several other people and put an entire judicial system here, this criminal justice facility at risk.

2. The circumstances of the offense

The court looks and weighs the circumstances of this offense, and of significance to the [c]ourt when it considers alternative sentencing, it considers, first of all, that there's more than one way to commit the offense of introducing contraband into a penal institution. Many times law enforcement officers are faced with a situation where they will arrest a person who's intoxicated or in some way has been arrested off the street, and that person may not even know that he possesses what it is that is found within his pockets. There are other times when a person will go on furlough or know that he has a report date and will secret within his undergarments or somewhere within his body something, a controlled substance, a small amount of controlled substance for his own use, a person who maybe be himself addicted

to some substance that he can't do without. That's very different than what we compare today in this situation.

. . . .

. . . [T]his is a planned undermining of the integrity and the security of the penal institution by one who holds a special understanding of the purposes and the procedures of that penal institution.

[Defense counsel], I'm not going to—for this record I want to say, and I'm not going to make a ruling based upon the fact that your client is an attorney. I'm telling you about a special place of trust that she has gained, and it just so happens she's an attorney. And this is a commission of an offense by one who is granted a high level of trust by the jail administration. That is important to this [c]ourt.

It would be important if she were a drug and alcohol program provider for someone in the court, the same type of thing. I'm not so concerned about the fact that she is an attorney as I am of this position of trust and the understanding she has about the window, the room, where it is, times, how to do this thing, special.

The trial court also enumerated several other factors it was relying on in considering the circumstances of the offense: (1) the involvement of others in the case, and the Defendant's leadership role in the commission of the offense; (2) the "significant" number of pills that were transported into the jail, and the Defendant's procurement of marijuana prior to the smuggling attempt; and (3) the fact that the Defendant's actions led to her client being sentenced to more time in jail, when she was "professionally bound to help Mr. Porter . . . minimize the amount of time" he spent in prison.

3. The Defendant's criminal record and social history

Moving on then, the [D]efendant's criminal record or lack thereof and her social history—we'll put those two together—there is no indication of prior offenses that are of consequence to this [c]ourt in its determination, and it's noted by the [c]ourt that she is before the [c]riminal [c]ourt as a defendant for her first time. The [c]ourt knows the [D]efendant is a well-educated professional. She's held a doctorate. At the time of these offenses she was married and gainfully employed.

The [c]ourt also considers that the [D]efendant reports to the presentence officer that she's used marijuana from the time she was 16 until 49. The [c]ourt notes that the [D]efendant is presently 50 years old and indicates a 33-year illegal drug usage, which is important for the [c]ourt to note. There's a use of cocaine that amounts to a varied usage over a 12-year period, from age 24 to 36.

These things are important to this [c]ourt in terms of criminal behavior, because it is criminal to use these items, and it's criminal to use them if you're 15 or if you're 49, and the [c]ourt takes that as part of its consideration in this case.

4. The Defendant's physical and mental health

There's an attachment to the presentence report. She's under the care of Dr. Jacobs. He has testified today she's seeing him weekly for her situation. He is a clinical psychologist. She has a history of mental health treatment and diagnosis, including depression, anxiety, ADD, bipolar, borderline personality disorder, acute agitation due to extreme stress. She has taken many medications. Many have been prescribed for her, including Wellbutrin, Zoloft, Paxil, Lamectil—I don't think I'm saying that correctly—Cymbalta, Xanax, and we just learned of a new one, Darvocet.

The [D]efendant reports to the presentence officer that her physical health is good, although she has a mild physical disability, and her mental health is fair, according to the [D]efendant. She reports that she is not, quote, mentally disturbed, unquote. She's presently being treated for major depression, anxiety, bipolar, personality disorder, borderline personality disorder, and the [c]ourt considers that as a factor, such a factor which is considered by the [c]ourt in determining a range of punishment within a particular felony offense.

Subsection 8 of 40-35-113 says, "The defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense. However, the voluntary use of intoxicants does not fall within the purview of this factor." And the [c]ourt does consider that factor in making its ruling today, along with those factors which are very heavily weighed other than this particular factor.

-10-

That concluded the trial court's ruling. The trial court did not further elaborate about the deterrence value or the likelihood that diversion would serve the ends of justice and best interests of the both the public and the accused.

The Defendant complains that the trial court did not properly weigh relevant factors, improperly gave controlling weight to the circumstances of the offense, and failed to consider the interests of the public and the accused and the ends of justice. Here, the trial court determined to deny diversion on the bases of the circumstances of the offense and the Defendant's amenableness to correction, including her "lack of candor." In our view, the trial court did not abuse its discretion in reaching that conclusion. Although the trial court did not elaborate extensively on all of the relevant diversion factors or explicitly state the weight it was applying to each factor, its findings implicitly show the weight it applied and evince a knowledge of the factors it was to consider. Substantial evidence exists to support the refusal.

The trial court discussed the factors it was applying to the Defendant at length. The trial court reviewed the Defendant's testimony and her written statement, concluding that the Defendant made many excuses for her behavior and attempted to minimize her role in the conspiracy. The trial judge stated that the Defendant's lack of candor reflected poorly upon her potential for rehabilitation. "Lack of candor and credibility are indications of a defendant's potential for rehabilitation." State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999). The trial court did not find the Defendant credible, and we will not second-guess the trial court in this regard. As for the circumstances of the offense, the trial court found several factors to be relevant: the method and planning used to commit the drug smuggling; the involvement of others persons; the Defendant's leadership role in the conspiracy; the quantity of drugs she attempted to introduce into the facility; and that her actions resulted in more jail time for her client. The trial judge specifically stated that he was not basing his ruling on the fact that the Defendant was an attorney, simply upon her "special place of trust" with the "jail administration." The record established that the Defendant abused her position of trust. See, eg., State v. William Blaine Campbell, No. E1999-02208-CCA-R3-CD, 2000 WL 1449875, at *3 (Tenn. Crim. App., Knoxville, Sept. 29, 2000) (this Court concluded that the trial court did not abuse its discretion in emphasizing a defendant's abuse of a position of trust in denying his request for judicial diversion). We note that the Defendant's abuse of her position of public trust is relevant both to the circumstances of her offense and to a determination of whether the ends of justice would be met by granting her judicial diversion. See State v. Donna F. Benson, No. W2001-01926-CCA-R3-CD, 2002 WL 31296110, at *6 (Tenn. Crim. App., Jackson, Oct. 8, 2002). We conclude that these factors are sufficient to support the trial court's denial of judicial diversion.

## Conclusion

We conclude that the trial court did not err or abuse its discretion in denying the Defendant's request for judicial diversion.  The judgment of the Sumner County Criminal Court is affirmed.

_____
DAVID H. WELLES, JUDGE