IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 9, 2008 Session

**STATE OF TENNESSEE  v. JOHN TATE**

**Direct Appeal from the Circuit Court for Madison County**
**No. 293-305    Donald H. Allen, Judge**

**No. W2007-02824-CCA-R3-CD  -  Filed August 17, 2009**

The Defendant-Appellant, John Tate ("Tate"), pleaded guilty to two counts of possession of a
Schedule III controlled substance with intent to sell, a Class D felony, with the length and manner
of service of the sentence to be determined by the trial court.  The Madison County Circuit Court
sentenced Tate as a Range I, standard offender; imposed two four-year sentences for each conviction
to be served concurrently, which were suspended; and ordered him to serve six months in the
Department of Correction before serving the remainder of his sentence on supervised probation.  In
his appeal, Tate argues the trial court erred by (1) denying judicial diversion, (2) sentencing him to
the maximum in the range, and (3) denying full probation.  Upon review, we reverse the trial court's
judgment regarding sentencing and remand the case for a resentencing hearing on all issues
regarding the length and manner of sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Reversed and Remanded**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and
ALAN E. GLENN, JJ., joined.

Danny R. Ellis, Jackson, Tennessee, for the defendant-appellant, John Tate.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General;
James G. (Jerry) Woodall, District Attorney General; and Shaun A. Brown, Assistant District
Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

        **Guilty Plea Hearing.**  At the guilty plea hearing, the prosecutor outlined the facts regarding
Tate's convictions:

[I]n Docket No. 07-293, on September [12,] 2006, officers with metro narcotics observed what they believed to be a drug transaction on the parking lot of Perkin's restaurant between [Mr. Tate and Mr. Cawthon who are] standing before the Court today. They saw Mr. Cawthon pull up [sic] into the parking lot and make contact with Mr. Tate and produce an amount of cash [which he gave] to Mr. Tate[,] and Mr. Tate then gave Mr. Cawthon a bottle and so [law enforcement] ended up stopping both of these individuals[,] and they discovered that the money totaled $1,750 that had been given from Mr. Cawthon to Mr. Tate and [that] what Mr. Tate had given Mr. Cawthon was a bottle that contained dihydrocodeinone[,] which is a Schedule III controlled substance as tested positive by the T.B.I. crime lab to be dihydrocodeinone[,] and the total number of tablets was 122 and a half tablets.

Thus, the State would show at trial on or about September [12,] 2006, both Mr. Tate and Mr. Cawthon did unlawfully and knowingly possess with intent to sell a controlled substance that being dihydrocodeinone, a Schedule III controlled substance, and that occurred in Madison County, Tennessee.

In Docket No. 07-305 on that same day of September [12,] 2006, officers asked Mr. Tate if he had any other controlled substances or any other pills[,] and he did voluntarily admit to Investigator Smith with metro narcotics that he did have those[,] and they were at home. Metro narcotics allowed Mr. Tate's girlfriend[,] who is Heather Moore, but now his wife, to recover those and turn those in[,] and they did take those into custody[,] and it was dihydrocodeinone, a Schedule III controlled substance, 337 tablets. Thus[,] the State would show at trial that on or about September [12,] 2006, Mr. Tate did unlawfully and knowingly possess with intent to sell a controlled substance that being dihydrocodeinone[,] a Schedule III controlled substance. That offense occurred in Madison County, Tennessee also.

**Sentencing Hearing.** At the November 20, 2007 sentencing hearing, the State's only proof was the presentence investigation report, which was entered into evidence. Defense counsel noted two stipulations for the trial court: (1) Tate cooperated with law enforcement to set up drug buys with four individuals, including one individual that pleaded guilty, and (2) Tate voluntarily notified law enforcement as to the existence of additional hydrocodone pills at his residence and gave these pills to the authorities, which resulted in his second felony charge. The defense's only proof at the sentencing hearing was Tate's testimony on his own behalf.

Tate testified that he lived with his wife and his three daughters, who were ages sixteen, thirteen, and eight months. He stated that his two oldest daughters were from his first marriage, and he had been awarded custody of them. He explained that he had attended college but lacked twelve to fifteen hours for a business management degree. He did not finish his degree because he was forced to find a job.

Tate started living with Heather Moore in August of 2005 following his divorce. In 2006, he worked at Dale's General Maintenance earning $20,238 annually. A copy of his 2006 tax return was entered into evidence. During 2006, he, Heather Moore, and his daughters lived in a rental

home, for which they paid $350 a month. At the time, Heather Moore earned eight dollars an hour at her job. Tate and Heather Moore were unable to pay all of their bills on their two incomes, which sometimes meant that they would not have the money to pay their telephone or cable bills for a couple of months. Tate said that he sold the hydrocodone pills to Mr. Cawthon to help pay his monthly bills following the death of his son, who was born four months prematurely:

> In March of 2006, [Heather Moore and I] had a little boy[,] and he lived six days[,] and when all that happened, Heather missed work. I missed work. We got behind. We were two or three months behind on rent. There was -- there were just-- I was lucky if I wanted to even work ten hours a week, let alone make myself go for 20. And then we got so far behind with everything else, I just got tired of struggling so much. I couldn't buy my kids anything, you know, [or provide] anything they needed. I mean, they couldn't go out with their friends because I didn't have the money. They couldn't, I guess what would you call, be a typical teenager. And [sic] . . . we got at least two months behind, if not three, I can't remember exactly, in rent because she didn't work for eight weeks[,] I believe. I didn't work for two [weeks] after the whole ordeal. I couldn't. I didn't want to go anywhere.

Heather Moore received counseling for the loss of their son, and her doctors would not allow her to work for two months after his death. Tate said that his youngest daughter also was born prematurely, and Heather was not allowed to work because of that difficult pregnancy. Tate acknowledged that the loss of his son did not excuse his criminal conduct:

> Just I know it's not a right [sic] excuse. It's just I was to the point I didn't care. I was willing to do whatever I had to do to take care of the kids I had left and just it -- I don't know how to explain it. I figured I had to do what I had to do and the job I was doing just wasn't enough.

Tate said that after he was arrested, he continued working at Dale's General Maintenance until the end of the year because his employer was not aware of his criminal case. He obtained a commercial driver's license and began working at a trucking company at night. Then he began working for that company during the day and another company from 3:30 p.m. to 2:00 a.m. He eventually moved to "driving local[ly] during the [day]" from 7:00 a.m. to 2:00 p.m. Tate said that he had worked all his life since the age of eighteen. He enlisted in the Army, received top secret clearance during his enlistment, and received an honorable discharge.

Tate said that he was raised in a religious home and went to a Christian school as a child. He and his family recently started attending a church that "feels like home." He explained his motivations for attending church again:

> When [his youngest daughter] was born, there was another member of the church that work[ed] for UPS. He used to come into DeVilbiss, and he invited us. Heather and I had talked about finding a church home[,] and we decided that we needed to [sic]. My older children have seen me live the wrong life their whole lives . . . and when [my youngest daughter] was born and then with -- well, with [my son]

dying last year and then with [my daughter] being born this year, I took it as a sign that I needed to change.

Tate said that he did not have a gun at the time he was arrested. When asked what would prevent him from engaging in criminal activity again if another catastrophe happened, Tate stated:

> I guess the main thing is my family. . . . I knew it was wrong then. Now, it's a spiritual decision where . . . one of the reasons I thought long and hard about going to the church was the simple fact that when I die, . . . I want to go to Heaven because I want to see my son. The other [reason] is my family. That's all I have.

> Tate said that he was currently employed, but his wife, Heather Moore, was not working. He admitted that he did not know how he would pay his bills if he was sent to jail. He said that he already was a little behind on the house note, and his utilities were usually paid on the very last day. Tate explained that it would be extremely difficult to obtain a job as a truck driver with a felony on his record.

At the close of his testimony, Tate supported his application for judicial diversion by noting that (1) he had no prior felony convictions, (2) there had been no past efforts at rehabilitation that had failed; (3) he believed he would be a good candidate for rehabilitation, (4) his offenses did not involve serious injury, and (5) there were no firearms involved in the crimes. He further asserted that he was depressed over the loss of his son at the time of his offenses, had committed these crimes in order to provide necessities for his family, had cooperated with law enforcement regarding additional drug buys, and had given undiscovered drugs to the police. Finally, defense counsel argued that Tate was the sole bread-winner for his three children, who lived with him.

The trial court denied the requested relief and sentenced Tate as a Range I, standard offender; imposed two four-year sentences for each conviction to be served concurrently, which were suspended; and ordered Tate to serve six months in "the Madison County Jail or Workhouse" before serving the remainder of his sentence on supervised probation. Tate filed a timely notice of appeal, and on January 8, 2008, the trial court ordered that Tate's period of incarceration was stayed pending his appeal to this court.

## ANALYSIS

**Denial of Judicial Diversion.** Tate argues that the trial court abused its discretion in denying his request for judicial diversion. He contends that the trial court did not consider all of the relevant factors and did not explain its reasoning for denying judicial diversion on the record. He asserts, "At the very least, one could argue that the trial judge merely addressed whether judicial diversion would serve the ends of justice, meaning the need to provide deterrence." He cites State v. Hooper, 29 S.W.3d 1 (Tenn. 2000), for the proposition that the trial court could not solely rely on deterrence as a reason to deny judicial diversion without having testimony from law enforcement or statistical data showing the need for deterrence. Finally, Tate contends that "the record is void of any substantive reason to deny [him] judicial diversion." In response, the State argues that there was substantial evidence to support the trial court's denial of diversion. The State contends that the

trial court did not abuse its discretion in denying judicial diversion because the record shows that the trial court weighed the appropriate factors for diversion. After a review of the record, we conclude that the trial court did not consider all of the factors for judicial diversion or weigh these factors in denying diversion.

Tennessee Code Annotated section 40-35-313 outlines the requirements for judicial diversion. After a qualified defendant is either found guilty or pleads guilty, a trial court has the discretion to defer further proceedings and place that defendant on probation without entering a judgment of guilt. T.C.A. § 40-35-313(a)(1)(A) (2006). A qualified defendant is defined as a defendant who pleads guilty to or is found guilty of a misdemeanor or a Class C, D, or E felony; is not seeking diversion for a sexual offense or a Class A or Class B felony; and does not have a prior conviction for a felony or a Class A misdemeanor. Id. § 40-35-313(a)(1)(B)(i) (2006). Upon the qualified defendant completing a period of probation, the trial court is required to dismiss the proceedings against him. Id. § 40-35-313(a)(2) (2006). The qualified defendant may then request that the trial court expunge the records from the criminal proceedings. Id. § 40-35-313(b) (2006).

Whether to grant or deny a request for judicial diversion lies within the trial court's sound discretion. State v. Harris, 953 S.W.2d 701, 705 (Tenn. Crim. App. 1996) (citation omitted). Accordingly, the trial court's decision regarding diversion will not be disturbed on appeal absent an abuse of discretion. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing State v. Hammersley, 650 S.W.2d 352, 356 (Tenn. 1983)). This court will conclude that the trial court did not abuse its discretion if the record contains "'any substantial evidence to support the refusal.'" State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992) (quoting Hammersley, 650 S.W.2d at 356).

The trial court must consider the following factors in deciding whether a qualified defendant should be granted judicial diversion: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) the deterrence value to the defendant and others; and (7) whether judicial diversion will serve the interests of the public as well as the defendant. Electroplating, Inc., 990 S.W.2d at 229; see also State v. Cutshaw, 967 S.W.2d 332, 343-44 (Tenn. Crim. App. 1997); State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9-10 (Tenn. 2000). The trial court may consider the following additional factors: "[the defendant's] attitude, behavior since arrest, prior record, home environment, current drug usage, emotional stability, past employment, general reputation, marital stability, family responsibility and attitude of law enforcement." State v. Washington, 866 S.W.2d 950, 951 (Tenn. 1993) (citations and internal quotation omitted). The trial court must weigh all of the factors in determining whether to grant judicial diversion. Electroplating, Inc., 990 S.W.2d at 229 (citing Bonestel, 871 S.W.2d at 168). Finally, "a trial court should not deny judicial diversion without explaining both the specific reasons supporting the denial and why those factors applicable to the denial of diversion outweigh other factors for consideration." Cutshaw, 967 S.W.2d at 344 (citing Bonestel, 871 S.W.2d at 168).

At sentencing, the record shows the trial court engaged in a lengthy discussion weighing the enhancing and mitigating factors applicable to Tate. The trial court's specific comments regarding judicial diversion were as follows:

> I do not find that Mr. Tate is an appropriate candidate for judicial diversion primarily because of the fact that these are – drug offenses are a serious problem for our judicial district. We have a man here who has admitted to possessing 450 or 460 pills for the purposes of [resale]. This is a problem in this district. It's a problem throughout every judicial district, I would assume. We have people coming to court every week who have drug addictions. They're a direct result of people selling hydrocodone out on the streets. The Court finds that he is not an appropriate candidate for judicial diversion.

The trial court's statement regarding its denial of judicial diversion considers the factors relating to the circumstances of the offense and the value of deterrence; however, the statement does not specifically discuss the other factors for judicial diversion and does not state why the factors favoring a denial of diversion outweigh the factors favoring diversion. In Curry, a pretrial diversion case, the Tennessee Supreme Court held "that the circumstances of the offense and the need for deterrence may alone justify a denial of diversion, but only if all of the relevant factors have been considered as well." State v. Curry, 988 S.W.2d 153, 158 (Tenn. 1999) (emphasis in original) (citing Washington, 866 S.W.2d at 951). This court has long held that "judicial diversion is similar in purpose to pretrial diversion and is to be imposed within the discretion of the trial court subject only to the same constraints applicable to prosecutors in applying pretrial diversion under [Tennessee Code Annotated] § 40-15-105." Anderson, 857 S.W.2d at 572. In this case, the record shows that although the trial court relied on the circumstances of the offense and the need for deterrence, it did not consider all of the factors relevant for judicial diversion or weigh these factors.

We acknowledge the trial court's reference to certain relevant factors for judicial diversion when it denied full probation:

> Now, with respect to how he should serve these sentences, I do find that the defendant does have the potential for rehabilitation. He has never been convicted of a felony before. He has very little criminal record; however, I can't overlook the fact that we're dealing with some very serious offenses and very serious criminal conduct. The Court finds that some period of confinement would be appropriate in order to avoid depreciating the seriousness of these offenses.

Here, the trial court's statements regarding probation referred to the following judicial diversion factors: the defendant's amenability to correction, the defendant's criminal record, and the circumstances of the offense. However, after stating that Tate had the potential for rehabilitation, the trial court did not explain why it believed Tate was amenable to correction. Curry, 988 S.W.2d at 157 (concluding that a prosecutor in determining whether to grant pretrial diversion should focus on a defendant's amenability to correction and consider "[a]ny factors which tend to accurately reflect whether a particular defendant will or will not become a repeat offender").

We additionally acknowledge that certain comments made by the trial court in considering the enhancement and mitigating factors relate to the factors for judicial diversion. In applying the enhancement factor regarding "a previous history of criminal convictions or criminal behavior," the trial court gave weight to the misdemeanor conviction for disorderly conduct "because [Tate] was placed on probation according to this for 11 months and 29 days. So that will be considered for enhancing purposes[,] and I do give this moderate weight." See T.C.A. § 40-35-114(1) (2006). However, both the State and Tate's attorney agree that the maximum sentence for disorderly conduct, a Class C misdemeanor, is thirty days. In considering the mitigating factors, the trial court acknowledged that Tate's crime "neither caused nor threatened serious bodily injury," which is also relevant to the judicial diversion factor regarding the circumstances of the offense. See id. § 40-35-113(1) (2006). We note that while a trial court's statements on other sentencing issues may relate to the factors for judicial diversion, the court is still required to consider all the appropriate factors in determining whether diversion is appropriate. See State v. Keaton M. Guy, No. E2007-01827-CCA-R3-CD, 2008 WL 5130729, at *7 (Tenn. Crim. App., at Knoxville, Dec. 8, 2008) (concluding that although the trial court did not "specifically enumerate" each factor regarding judicial diversion, the court "did address the requisite considerations in arriving at its decision to deny diversion."), applic. for perm. to appeal filed (Tenn. Jan. 29, 2009); see also State v. Aune Kornegay, No. E2007-00645-CCA-R3-CD, 2008 WL 1901115, at *7 (Tenn. Crim. App., at Knoxville, Apr. 30, 2008) (concluding that although "[t]he findings made by the trial court [regarding] the enhancing and mitigating factors [related] to several of the judicial diversion criteria," the court failed to consider all of the diversion factors.), no applic. for perm. to appeal filed.

Although the trial court's statements during Tate's sentencing hearing referred to certain factors relevant to judicial diversion, the trial court did not adequately consider Tate's potential for rehabilitation, social history, physical and mental health, and whether judicial diversion would serve the interests of the public as well as the defendant. As previously discussed, in order to facilitate meaningful appellate review, a trial court is required to state on the record the weighing process it uses in balancing all of the factors and the calculus relied upon in reaching the ultimate conclusion. Electroplating, Inc., 990 S.W.2d at 229 (Tenn. Crim. App. 1998); Cutshaw, 967 S.W.2d at 344 (citing Bonestel, 871 S.W.2d at 168). Because the record shows that the court failed to consider all of the factors appropriate for judicial diversion and failed to weigh all of these factors in determining whether to grant diversion, we are unable to determine whether the trial court abused its discretion. Accordingly, we are compelled to reverse the judgment of the trial court and remand the case for a sentencing hearing in order for the trial court to explain adequately on the record why the appellant was denied judicial diversion and why the factors relied upon outweigh the others. See State v. Lewis, 978 S.W.2d 558, 567 (Tenn. Crim. App. 1997) (concluding that "[b]ecause the trial court failed to consider all of the factors appropriate to the grant or denial of judicial diversion, and because its statement of the reasons for denial is vague and conclusory, we find the record inadequate to allow appropriate appellate review.").

Tate's two remaining issues regarding the length of his sentence and the denial of full probation are pretermitted by our aforementioned disposition. Accordingly, we will not consider them at this time.

## CONCLUSION

-7-

Upon review, we reverse the trial court's judgment regarding sentencing and remand the case for a resentencing hearing on all issues regarding the length and manner of sentence, including Tate's application for judicial diversion.

_____
CAMILLE R. McMULLEN, JUDGE