# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 19, 2010

## STATE OF TENNESSEE v. JOSHUA BRYANT MCCLAIN

**Appeal from the Circuit Court for Hickman County**
**No. 08-5032B      Timothy Easter, Judge**

---

**No. M2009-00942-CCA-R3-CD - Filed August 17, 2010**

---

The Defendant, Joshua Bryant McClain, pleaded guilty to vandalism of cemetery monuments in an amount over $10,000. After a sentencing hearing, the trial court denied the Defendant's request for judicial diversion and sentenced the Defendant to five years; after the service of 150 days in jail, his sentence was to be suspended for a six-year period. The trial court also ordered the Defendant to pay $5,000 in restitution to the cemetery association. The Defendant now appeals, challenging the denial of judicial diversion, the length of his sentence, and the restitution award. After a review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Vanessa P. Bryan, District Public Defender; and J. Gregory Burlison, Assistant Public Defender, Franklin, Tennessee, for the appellant, Joshua Bryant McClain.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Kim R. Helper, District Attorney General; and Michael J. Fahey, II, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

A Hickman County grand jury returned an indictment against the Defendant, Joshua Flynn, and Christopher Pollock on May 5, 2008, charging them with vandalism of property

valued at $60,000 or more, a Class B felony.  See Tenn. Code Ann. §§ 39-14-105 (grading), 39-14-408 (vandalism).  Thereafter, on March 25, 2009, the Defendant and his codefendants pleaded guilty to a lesser grade of vandalism, property valued at $10,000 or more but less that $60,000, a Class C felony.[1]  See Tenn. Code Ann. § 39-14-105.  Pursuant to the terms of the plea agreement, the Defendant was to be sentenced as a Range I, standard offender, all other matters—the length of the sentence and the manner of service of the sentence, including the availability of judicial diversion—were submitted to the trial court for determination.

At the guilty plea hearing the State provided a factual basis for the plea.  The prosecutor recited the events as follows:

Deputy Garland received a call about some damage to the cemetery. . . .

But there was, essentially, a great amount of damage.  There would have been testimony that the damage replacing stones would have exceeded actually $60,000, Judge, in this case, but certainly exceeding 10, and that upon investigation, the deputy found a movie, a rental DVD, was able to trace that to the person who had checked it out.  That led him to [the Defendant] who was the driver.

Deputy Garland was able to determine that these individuals were all in the same vehicle, in [the Defendant's] vehicle at the time that the vandalism was committed.  That's how he was able—they had been stopped and picked up in Hohenwald by police for, I believe, a traffic offense and also had some road signs or something in the back of the vehicle.  But anyway, Deputy Garland was able to then get information from Hohenwald, also talked with [the Defendant] and get the statements regarding all their presence there at the time when one, two, three or more of them actually pushed over all of the—on of the statements indicated that they went out there to—because they had heard it was h[a]unted and decided to go out there.

Immediately following entry of guilty pleas by all three men, a sentencing hearing was held.

The State first called Deputy Brad Garland, who recounted the facts and circumstances of the vandalism at Bethel Cemetery in December 2007.  According to Deputy Garland, six men, three of whom were juveniles, committed the vandalism. Deputy Garland relayed that he did take a statement from the Defendant, who first denied any involvement

---

[1] All three men were convicted and sentenced at the March 25, 2009 hearing.  However, the codefendants are not involved in this appeal.

in the crime before confessing to driving the other five men to the cemetery. He also obtained an inculpatory statement from Christopher Pollock.

Martha N. King, a member of Bethel Cemetery's Board of Directors, was next to testify. Because she lived in the area, Ms. King was the first to see the damage done to the cemetery. Ms. King described it as looking like "a war zone." She testified that approximately twenty-three gravestones had been damaged during the vandalism. While the cemetery had been vandalized on prior occasions, there had never been an act of this magnitude. After the December 2007 vandalism, Ms. King paid $482.30 (of her own money) to have a security light installed. One of the other board members agreed to pay the monthly operation fee for the light (about $7 per month).

While others assisted, Ms. King was the person primarily responsible for repairing the damage done to the cemetery. The cemetery operated through donations; there was no operating budget. Ms. King obtained three estimates from monument companies in the area about repairing the damage. The first estimate introduced into evidence was from Lawrenceburg Monument Company, reflecting an estimate of $7,500 for "up-riding and stabilizing" the monuments in Bethel Cemetery. This estimate did not include replacing any stones. She provided two more estimates covering basically the same work, one from Hickman County Monument Company for $2,500, and the other from Leoma Monument Works ("Leoma") for $1,725. The association ultimately chose Leoma to complete the repairs, however, the work was not done well and, according to Ms. King, needed to be redone. Finally, the cemetery association got an estimate from Leoma on replacing the damaged stones. The estimate reflected a price of $78,000 to replace the marble stones and a price of $18,000 to replace the granite stones. While the stones had gotten muddy from the vandalism, the association was never able to pay anyone to clean them, the lowest offer being $800.

The State then presented two witnesses personally affected by the vandalism, Ms. Lela McCalren and Mr. Roger Smith. These witnesses testified to the emotional impact the vandalism had on their lives.

The twenty-year-old Defendant testified on his own behalf. According to the Defendant, on the night in question, he (then eighteen years old) and five other young men had been drinking and "decided to go riding around." He pulled up to the cemetery because someone needed to urinate; then, "two people decided to jump out and play around." After about fifteen to twenty minutes, the Defendant saw a trash can "fly," so he shined his headlights into the cemetery to see what was going on. The men in the cemetery "were causing a problem" so he yelled at them to get back in the truck. They then left the cemetery. Later that evening, the Defendant was pulled over for running a red light, and stolen street

signs were found inside the truck. His co-defendant corroborated that the Defendant did not exit the vehicle at the cemetery on the night in question.

After the vandalism, the Defendant had been arrested for criminal trespassing at a Hardee's restaurant where he had previously worked. He received thirty days probation for that offense, which he completed. At the time of the hearing, the Defendant's driver's licence was suspended due to unpaid tickets, including running the red light on the evening in question and reckless driving on another date in December 2007. The fines had never been paid. A court officer had told him to "put back $92 a week for six weeks" in order to get his license back. The Defendant also had not been paying child support ($65 per week) for his infant daughter and was unsure if he had ever paid any. At arraignment, the Defendant was ordered to pay a $50 administrative fee and $50 per month to the court for his attorney's fees; the Defendant believed he had paid only $100 toward these fees.

The Defendant relayed that he currently resided with his mother in Perry County. Since December 2007, the Defendant had moved around a lot, moving from his father's, to a friend's, to his sister's, and then to his mother's, only moving to his mother's about two weeks before the sentencing hearing. Several of the moves had been precipitated by disagreements. The Defendant was, at the time of sentencing, employed by Affordable Movers in Columbia and worked about thirty-five to forty hours a week, making between $8.50 and $9 per hour. He had previously only worked at Hardee's for five or six months. The Defendant stated that he was a senior when he dropped out of high school, but now wanted to get his GED as soon as he had enough money. The Defendant admitted that drugs and alcohol had been a problem for him in the past, but stated that he no longer used either. Additionally, we note that the trial court ordered the Defendant to submit to a drug test at the hearing. The Defendant tested negative for all illegal substances.

At the conclusion of the hearing, the trial court denied the Defendant's request for judicial diversion. The trial court then sentenced the Defendant to five years for his Class C felony conviction. His sentence was to be suspended following service of 150 days in jail, and the Defendant was to be placed on probation for six years. The trial court also ordered restitution in the amount of $5,000 to the cemetery association. The Defendant now appeals from the sentencing decision of the Hickman County Circuit Court.

**Analysis**

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of

this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999); see also State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008). If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also Carter, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

## I. Judicial Diversion
The Defendant argues that the trial court erred by denying his request for judicial diversion. Specifically, he argues that the trial court did not adequately consider or improperly weighed several factors against the Defendant: "amenability for correction, the circumstances of the offense, physical and mental health, the deterrence value to the [D]efendant and others, and whether judicial diversion will serve the ends of justice—the interests of the public as well as the [D]efendant." Furthermore, the Defendant complained that "the trial court chose to weigh some of the additional factors for consideration, but failed to give proper weight to the factors in [the Defendant's] favor."

"Judicial diversion is a legislative largess whereby a defendant adjudicated guilty may, upon successful completion of a diversion program, receive an expungement from all 'official records' any recordation relating to 'arrest, indictment or information, trial, finding of guilty, and dismissal and discharge' pursuant to the diversion statute." State v. Schindler, 986 S.W.2d 209, 211 (Tenn. 1999). The effect of discharge and dismissal under the diversion statute "is to restore the person . . . to the status the person occupied before such arrest or indictment or information." Id. (citing Tenn. Code Ann. § 40-35-313(b) (1997)).

A criminal defendant is eligible for judicial diversion only if he has been convicted of a misdemeanor or a class C, D, or E felony and he must not have been previously convicted of a felony or a Class A misdemeanor. Tenn. Code Ann. § 40-35-313(a)(1)(A). However, eligibility under the diversion statute does not ensure the grant of diversion. Indeed, the decision of whether to place a defendant on judicial diversion is within the sound discretion of the trial court. State v. Harris, 953 S.W.2d 701, 705 (Tenn. Crim. App. 1996). Thus, upon review by an appellate court, if "any substantial evidence [exists in the record] to support the refusal," the decision of the trial court will be upheld and this court will not revisit the issue. State v. Hammersley, 650 S.W.2d 352, 356 (Tenn. 1983).

In making the determination of whether to grant judicial diversion, the trial court must consider the following factors: (a) the accused's amenability to correction; (b) the circumstances of the offense; (c) the accused's criminal record; (d) the accused's social history; (e) the status of the accused's physical and mental health; and (f) the deterrence value to the accused as well as others. State v. Lewis, 978 S.W.2d 558, 566 (Tenn. Crim. App. 1997) (citing State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993)). The trial court should also consider whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused. Id. Additional factors which may be considered include a defendant's attitude, behavior since his arrest, home environment, current drug usage, emotional stability, past employment, general reputation, family responsibilities, and the attitude of law enforcement. Id. (citing State v. Washington, 866 S.W.2d 950, 951 (Tenn. 1993)).

In making its determination to deny the Defendant's request for judicial diversion, the trial court considered the following factors:

1. The Defendant's amenability to correction

That's a hard one. And I would say it's almost fairly balanced for you, [Defendant], but your conduct in failing to follow through on Judge Bivins' rulings regarding payment to the court on your attorney's fees, it indicates to me that you don't take court orders very seriously and that's part of amenability to correction. So I'm—a struggle with that one, but I would say at the end of the day after weighing your amenability that it weighs against you.

2. The circumstances of the offense

The circumstances of the offense are horrendous. I've already described how the [c]ourt views them. It is something that is senseless, no justification. It

-6-

wasn't just a youthful indiscretion. This is something that goes well beyond that and that factor weighs heavily against diversion.

. . . .

. . . Under the circumstances of this offense another reason, you know, in a lot of ways you were the leader in this thing. You were the driver of the vehicle. You were the one who brought everybody there. You were the one who had the opportunity to make it not even happen. You could have not gone there. You were the one behind the wheel. So, again, that's another reason why the circumstances of this offense weigh against diversion.

3. The Defendant's criminal record

Your criminal record as has been argued and the [c]ourt realizes is up until the time of this offense pretty much nonexistent. But since that time has—you started to grow it like a little crop. You're starting to grow a criminal history—a criminal record. I don't know where all of that is coming from. I would have thought that would have gotten your attention. But at the time this offense was committed, you had no criminal record. But the fact that you're starting to head down that path causes the [c]ourt great concern and will just say that factor is fairly balanced evenly. It doesn't weigh in your favor and it doesn't weigh against you.

4. The Defendant's social history

Your social history, it's not good. It weighs against you. And I'll be honest with you and tell that one of the main factors about that is you're—you're not taking care of your child. A person who really has a desire to support their children will make every effort to pay their child support. They would turn over every rock, make every phone call. They'd do whatever to take care of their children and you're not doing that.

You have—you also have not completed high school. You're what we call a dropout, high school dropout. That doesn't speak well for someone who's seeking diversion. . . . [S]o that weighs against you to be honest with you.

5. The Defendant's physical and mental health

Your physical and mental health, I'm satisfied is evenly balanced. I don't really have any proof one way or the other on that. You seem to be in good shape.

6. The deterrence value to the Defendant as well as others

The deterrence value to the accused and as well as others weighs heavily against diversion in this case. Again, this is the type of offense that people need to know, particularly, young people. You do it and you don't walk away from it without a record. It's obviously been upsetting to a number of people. People that you will never even know. You'll never know—the three of you will never know how many lives you've disturbed because of your conduct. So that factor weighs against the diversion.

7. Whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused

Whether judicial diversion will serve the interest of the public as well as the accused, the [c]ourt finds there is absolutely no way diversion in this case would serve the interest of justice. I'm hoping to fashion a sentence that might do that. But an absolute no record, to walk away from it with nothing would not in this [c]ourt's view serve the interest of justice and would send the wrong message.

8. Additional factors

I've also considered your attitude, it seems to be better. It seems to be getting better, so that's something that helps you. Your home environment is not good. You bounced from place to place. . . . Your current drug usage, apparently, is under control and your emotional stability, past employment, general reputation, family responsibilities, all really weigh against you, particularly, that family responsibility one. And your attitude of law enforcement, I really have heard nothing about that, so I would call that an even balance.

Our review of the record reflects that the trial court gave full and proper consideration to the criteria that must be considered prior to the grant or denial of judicial diversion. The evidence in the record supports the trial court's conclusion; therefore, we may not revisit the issue. We cannot conclude that the trial court abused its discretion. The decision of the trial court denying judicial diversion is affirmed.

## II. Length of Sentence

The Defendant contends that the trial court erred in setting the length of his sentence.[2] The Defendant was convicted of vandalism of property valued at $10,000 or more but less than $60,000, a Class C felony. See Tenn. Code Ann. §§ 39-14-105 (grading), 39-14-408 (vandalism). As a Range I, standard offender the Defendant's sentencing range was three to six years. See Tenn. Code Ann. § 40-35-112(c)(5). The trial court imposed an enhanced sentence of five years. The Defendant was to serve 150 days in jail; after which, his sentence was to be suspended, and he was to be placed on probation for a period of six years.[3]

The Defendant's conduct occurred subsequent to the enactment of the 2005 amendments to the Sentencing Act, which became effective June 7, 2005. The amended statute no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. As further explained by our supreme court in Carter,

> the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]." [Tenn. Code Ann.] § 40-35-210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," [Tenn. Code Ann.] § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," [Tenn. Code Ann.] § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," [Tenn. Code Ann.] § 40-35-103(5).

Id. (footnote omitted).

The 2005 Amendment to the Sentencing Act deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered these factors merely advisory, as opposed to binding, upon the trial court's sentencing decision. Id. Under current sentencing law, the trial court is nonetheless required to "consider" an advisory sentencing guideline that is relevant to the sentencing determination, including the application of enhancing and

_____

[2] We note that a unified judgment document is not included in the record on appeal. However, we are able to discern the sentence imposed from the sentencing transcript and, therefore, we will review the issue.

[3] Tennessee Code Annotated section 40-35-303(c)(1) specifically allows a trial court to impose a more lengthy probation period for a defendant than the actual imposed sentence, stating that, "even though the length of the actual sentence is restricted to that required by the particular range, the judge may fix the length of probation up to the statutory maximum for the class of the offense."

mitigating factors. Id. at 344. The trial court's weighing of various mitigating and enhancing factors is now left to the trial court's sound discretion. Id. Thus, the 2005 revision to Tennessee Code Annotated section 40-35-210 increases the amount of discretion a trial court exercises when imposing a sentencing term. Id. at 344.

To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See id. at 343; State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001). If our review reflects that the trial court applied inappropriate mitigating and/or enhancement factors or otherwise failed to follow the Sentencing Act, the presumption of correctness fails and our review is de novo. Carter, 254 S.W.3d at 345.

In sentencing the Defendant to five years, the trial court found three enhancement factors to be applicable. First, the trial judge found that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his range, noting that the Defendant had a history of criminal conduct due to his usage of illegal drugs and underage consumption of alcohol. See Tenn. Code Ann. § 40-35-114(1). The trial court also determined that the Defendant was a leader in the commission of the offense involving two or more criminal actors: "You were a leader in this whether you participated once you got there or not, you got them there, and in my view, that makes you a leader . . . ." See Tenn. Code Ann. § 40-35-114(2). Finally, the trial court noted that the offense involved more than one victim, stating "you'll never know how many lives you've victimized by this conduct." See Tenn. Code Ann. § 40-35-114(3). In mitigation, the trial court found that the Defendant's conduct neither caused nor threatened serious bodily injury and that the Defendant, because of youth or age, lacked substantial judgment in committing the offense. See Tenn. Code Ann. § 40-35-113(1), (6).

The Defendant argues that he played only a "minor role" in the commission of the offense, which should have been recognized by the trial court. He contends that, if his role was properly recognized, the trial court "would have been considering three (3) mitigating factors in [the Defendant's] favor and only two (2) enhancement factors." Thus, he submits that the trial court improperly weighed the enhancing and mitigating factors.

After our review, we conclude that the trial court properly considered the required sentencing principles and all relevant facts and circumstances. The Defendant admitted to a history of illegal drug use and underage alcohol consumption. Apparently under a belief that the cemetery was haunted, the Defendant drove the group to the cemetery. Many families were victimized by their conduct once there. These enhancement factors were

appropriately considered by the trial court. Again, we note that the weighing of various mitigating and enhancing factors is left to the trial court's sound discretion. We conclude that the trial court did not err or abuse its discretion in enhancing the Defendant's sentence to five years.

## III. Restitution

The Defendant also challenges the trial court's order regarding the payment of restitution, arguing both that the amount was excessive and that, even if proven, the trial court failed to consider the financial resources and future ability of the Defendant to pay the restitution amount, findings required by Tennessee Code Annotated section 40-35-304(d). The State submits that the record supports the restitution award.

When a defendant challenges the validity and amount of restitution, this Court must conduct a de novo review of both the amount of restitution ordered and the method by which it was determined. State v. Johnson, 968 S.W.2d 883, 884 (Tenn. Crim. App. 1997) (citing Tenn. Code Ann. § 40-35-401(d) (1990); State v. Frank Stewart, No. 01-C-019007CC00161, 1991 WL 8520, at *1 (Tenn. Crim. App., Nashville, Jan. 31, 1991)). The trial court is entitled to a presumption of correctness. Tenn. Code Ann. § 40-35-401(d).

A trial court, in conjunction with a probated sentence, may order a defendant to make restitution to the victims of the offense. See Tenn. Code Ann. § 40-35-304(a). "The purpose of restitution is not only to compensate the victim but also to punish and rehabilitate the guilty." Johnson, 968 S.W.2d at 885. The statue that governs restitution as a condition of probation provides, in pertinent part, as follows:

> (b) Whenever the court believes that restitution may be proper or the victim of the offense or the district attorney general requests, the court shall order the presentence service officer to include in the presentence report documentation regarding the nature and amount of the victim's pecuniary loss.

> (c) The court shall specify at the time of the sentencing hearing the amount and time of payment or other restitution to the victim and may permit payment or performance in installments. The court may not establish a payment or performance schedule extending beyond the statutory maximum term of probation supervision that could have been imposed for the offense.

> (d) In determining the amount and method of payment or other restitution, the court shall consider the financial resources and future ability of the defendant to pay or perform.

(e) For the purposes of this section, "pecuniary loss" means:

(1) All special damages, but not general damages, as substantiated by evidence in the record or as agreed to by the defendant; and

(2) Reasonable out-of-pocket expenses incurred by the victim resulting from the filing of charges or cooperating in the investigation and prosecution of the offense; provided, that payment of special prosecutors shall not be considered an out-of-pocket expense.

Tenn. Code Ann. § 40-35-304(b)-(e).

Special damages are those which are "'the actual, but not the necessary, result of the injury complained of, and which in fact follow it as a natural and proximate consequence.'" State v. Lewis, 917 S.W.2d 251, 255 (Tenn. Crim. App. 1995) (quoting Black's Law Dictionary 392 (6th ed. 1990)). General damages are those which are "'the necessary and immediate consequence of the wrong.'" Id. (quoting Webster's New International Dictionary 664 (2d ed. 1957)). It is unnecessary for the sentencing court to determine restitution in accordance with the strict rules of damages applied in civil cases. Johnson, 968 S.W.2d at 887.

The sum of restitution ordered must be reasonable and does not have to equal the precise pecuniary loss. State v. Smith, 898 S .W.2d 742, 747 (Tenn. Crim. App. 1994). There is no set formula. Johnson, 968 S.W.2d at 886. The sentencing court must consider not only the victim's loss but also the financial resources and future ability of the defendant to pay. Tenn. Code Ann. § 40-35-304(d); State v. Bottoms, 87 S.W.3d 95, 108 (Tenn. Crim. App. 2001). In ordering restitution, the trial court shall specify the amount of time and payment and may permit payment or performance of restitution in installments. Tenn. Code Ann. § 40-35-304(c). The court may not, however, establish a payment or schedule extending beyond the expiration of the sentence. Tenn. Code Ann. § 40-35-304(g)(2). If the defendant, victim, or district attorney petitions the trial court, it may hold a hearing and, if appropriate, waive, adjust, or modify its order regarding restitution. Tenn. Code Ann. § 40-35-304(f). Further, any unpaid portion of the restitution may be converted to a civil judgment. Tenn. Code Ann. § 40-35-304(h)(1); Bottoms, 87 S.W.3d at 108.

Although the trial court did not make specific findings in setting the restitution award, the records supports the amount. Ms. King testified that the cemetery operated through donations and that there was no operating budget. Ms. King obtained three estimates from monument companies in the area, the cemetery association ultimately paying Leoma $1,725 to upright and stabilize the damaged monuments. However, according to Ms. King, this

work was not done well and needed to be redone. Leoma also provided the cemetery association an estimate to replace the stones: $78,000 to replace the marble stones and $18,000 to replace the granite stones. Also, the association did not have money to pay anyone to clean the stones and did most of the work themselves. After the vandalism, Ms. King paid $482.30 (of her own money) to have a security camera installed, and one of the other board members agreed to pay the monthly operation fee for the light (about $7 per month).

As for the Defendant's financial resources and ability, the Defendant currently resided with his mother, having minimal living expenses. Also, at the time of sentencing, the Defendant was employed by Affordable Movers in Columbia and worked about thirty-five to forty hours a week, making between $8.50 and $9 per hour. Therefore, the record established that the Defendant had the ability to pay the amount ordered over a period of six years. The amount of restitution was reasonable.

## Conclusion

Based upon the foregoing reasoning and authorities, we conclude that the trial court did not err in denying the Defendant's request for judicial diversion or in enhancing the Defendant's sentence to five years. Additionally, the $5,000 restitution award was proper. The judgment of the Hickman County Circuit Court is affirmed.

_____
DAVID H. WELLES, JUDGE