# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
July 19, 2011 Session

## STATE OF TENNESSEE v. BETHANY JADE ABEL

**Appeal from the Circuit Court for Hickman County**
**No. 10-5047CR     Robbie T. Beal, Judge**

_____

**No. M2011-00334-CCA-R3-CD - Filed August 9, 2011**

_____

A Hickman County Grand Jury indicted the Defendant, Bethany Jade Abel, for attempted first degree murder, a Class A felony. The Defendant pled guilty to aggravated assault, a Class C felony, with the length and manner of service for her sentence left to the discretion of the trial court. The trial court sentenced the Defendant to 3 years in the Tennessee Department of Correction, suspended to supervised probation following the service of 14 days in the county jail. In this appeal as of right, the Defendant contends that the trial court erred in denying her application for judicial diversion. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

John S. Colley, III, Columbia, Tennessee, for the appellant, Bethany Jade Abel.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Assistant Attorney General; Kim R. Helper, District Attorney General; and Kate Yeager, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arose from the Defendant's stabbing of her estranged husband. On December 16, 2009, the Defendant called the victim and asked him to meet her outside his parent's residence to discuss their marriage. On her way to meet the victim, the Defendant purchased a knife. When the Defendant arrived at the residence, she asked the victim to get into her car. Once the victim was in the car, the two had a short conversation before the

Defendant swung at the victim with a knife, stabbing him once in the shoulder and once in the face. The stab to the shoulder was deflected by the victim's jacket; however, the Defendant cut the victim's face, wounding him from his chin to his ear. The victim fled from the Defendant's car, and the Defendant chased after the victim, screaming, "I'm going to kill you!" The victim eluded the Defendant and called 9-1-1. The victim was taken to the hospital, where his injuries were treated. As a result of his injuries, the victim received a total of 22 stitches to his chin and face and owed $1900.66 in medical bills for the ambulance service and medical treatment.

At the guilty plea submission hearing held on October 26, 2010, the Defendant waived the recitation of the factual circumstances supporting her plea and agreed that the State could prove that she was guilty of aggravated assault.

At the sentencing hearing held on December 21, 2010, the victim testified that he and the Defendant had been married since May 2007. He said that they were separated when the incident occurred. The victim testified that he was "not seeking the maximum" sentence for the Defendant but that he would like to be reimbursed for his medical expenses and that he believed the Defendant should serve "90 to 180 days" in jail for her actions. The victim said that he thought the Defendant should serve some time because if she had hit him four inches lower, he would have died.

On cross-examination, the victim said that he and Defendant had two children together. He admitted that he had a new girlfriend who was pregnant by him and that on the night of the altercation, he had called the Defendant and left her messages. He admitted that a week prior to the altercation, he had called the Defendant and that he and his new girlfriend had left a message on the Defendant's voicemail. He also admitted that after the altercation, his parents kicked him out of the house, blamed him for what happened, and told him that "they wished that [the Defendant] wouldn't have missed [his] throat." He said that the Defendant and her parents had been caring for his children but said that he could care for the children if the Defendant were sent to jail. He acknowledged that he had only been allowed to see his children while supervised but explained that he could still provide for them.

When asked whether the Defendant was a "violent lady," the victim said that the Defendant had attacked him a few days prior to the altercation. He said that the Defendant attacked him while he was "sleeping out in the living room of [his] parent's house" and that his sister "had to pull" the Defendant off him.

Steve Wallick, the victim's uncle, testified for the defense. Mr. Wallick said that he thought the Defendant "was dedicated to her marriage" and that she was "the only parent her kids have." He said that he had never seen the Defendant "be violent in any way" or "act in any way other than [as] a loving mother and wife." He said that he and the victim's family

were "more supportive" of the Defendant than the victim. On cross-examination, he admitted that he did not witness the altercation between the Defendant and the victim.

Mary Numinen, the Defendant's mother, testified that the Defendant was living with her and had been living with her for "a little over a year." She said that the Defendant and the victim had both lived with her "a couple of times" and that during those time periods, she had an opportunity to observe their marriage. She said that the Defendant was a "very good" wife that waited on the victim and "did everything for the children herself." She said that the Defendant was not abusive and that she had never seen the Defendant commit an act of violence. She said that the Defendant was a Girl Scout and had received a Gold Award, the highest award available, while in high school. She said that the Defendant completed a lot of community service and volunteer work in order to receive the Gold Award. She said that the Defendant had never been in trouble. She said that the Defendant had been working full time and trying to take care of the children before this happened and that the victim had been "calling, calling, calling, calling, [and] texting her." She said that the victim had been "harassing" and "manipulating" the Defendant prior to the altercation.

Ms. Numinen testified that after the Defendant committed the offense, the Defendant went to a therapist and took a domestic abuse class. She said that the Defendant had also gone back to college and was "trying to finish her degree."

On cross-examination, Ms. Numinen testified that in October 2009, the victim hit the Defendant and threw one of the children "up against the wall." She said that the Defendant and the children moved in with her after that incident. She said that the Defendant had a restraining order against the victim but that the Defendant ultimately "dropped the charges" against the victim. She stated that they were worried about the Defendant because her behavior toward the victim was "very, very unlike her." She said that they found out that the Defendant had polycystic ovarian syndrome, which affected her hormones. She said that the Defendant had a hysterectomy, was taking medication, and attending counseling. She said that the Defendant only needed to complete two classes to obtain her Associate's Degree.

Chief Paul Rigsby of the Nolensville Police Department testified that he had known the Defendant and her family for approximately seven years. He stated that the Defendant was a "good person and [had] just never been in any trouble." He stated that he was "shocked" to hear about what the Defendant did to the victim and said that he believed it was a "one-time incident." He said that he believed the Defendant had a "very good" potential for rehabilitation because he thought that she "just got pushed to the edge and [had been] put in a bad situation." On cross-examination, Chief Rigsby admitted that he "briefly dated" the Defendant several years ago before the Defendant met the victim but stated that they had remained friends.

The Defendant testified that she knew she was not justified in her behavior toward the victim and that she realized that she had other options in attempting to deal with the situation. She said that two months prior to the incident, the victim had picked up her daughter and threw the child against the wall. She said that the night before the incident, the victim had called her approximately 30 times and that on the last message that he left, she could hear him talking to his new girlfriend. She said that she "[j]ust wanted it to end" and that she purchased the knife at a "convenience store on the way" to the victim's house. She said that she was sorry for what she did and that she would not do it again. She said that since the incident, she had gone back to school and attended therapy. She said that she hoped to become a social worker but that she believed that if she were convicted of a felony, it would be hard for her to obtain employment.

On cross-examination, the Defendant admitted that she was mad at the victim because he had been lying to her about his girlfriend. She admitted that she said she had wanted to "end this" but said that she did not believe she would have killed the victim. She said that she was "under a lot of stress" and that she said things that she did not mean. She said that if the victim had told her the truth, she would not have stabbed him. She said that she did not intentionally cut the victim's face and that she only swung at the victim once. She said that the victim's face was cut when he grabbed at the knife. She admitted that her actions could have killed the victim.

In sentencing the Defendant, the trial court did not apply any enhancement factors. On the contrary, the trial court applied the following statutory mitigating factors:

> (2) the defendant acted under strong provocation;
>
> (10) the defendant assisted the authorities in locating or recovering any property or person involved in the crime; [and]
>
> (11) the defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct[.]

Tenn. Code Ann. § 40-35-113(2), (10), (11). In accordance with the catch-all mitigating factor, the trial court applied weight to the fact that the Defendant had significant support from the community, that she had "taken it upon herself to get some psychological assistance," that she was remorseful for her actions, and that she had "suffered to a degree the consequences of her actions already." Tenn. Code Ann. § 40-35-113(13).

The trial court also considered the fact that the Defendant had been charged with a Class A felony that carried a potential sentence of 15 to 25 years. The trial court admitted

that it was appropriate for the Defendant to plead to a lesser felony but stated that it should consider the indicted offense in sentencing the Defendant. The court found that the circumstances of the offense were egregious. The court noted that the Defendant intended to kill the victim and that she would have killed the victim if the cut had been four inches lower.

The court found that the Defendant's social history was "perfect," that her amenability to correction was "very high," and that it did not believe that she would have a hard time with probation. The court stated that the public interest diversion factor was "a problem" because it could not "send a message that if you're having issues in your marriage, [then] you can ambush your estranged spouse with a knife on a darkened road somewhere." The court held that diversion was not appropriate because it would send the "wrong message to the community" and would "undermine[] the significance of the offense." In so holding, the trial court denied judicial diversion and set the length of the Defendant's sentence at 3 years, suspended to probation following the service of 14 days in the county jail.

## ANALYSIS

The Defendant contends that the trial court erred in denying judicial diversion because there was no substantial evidence to support the denial of diversion given the unusual circumstances of the case and the fact that most of the factors weighed heavily in favor of granting judicial diversion. The State responds that the trial court properly considered and weighed the relevant factors before denying judicial diversion. The Defendant responds that the trial court's sentencing decision should not be afforded a presumption of correctness because the trial court failed to sentence her as an especially mitigated offender as "required" pursuant to Tennessee Code Annotated section 40-35-109.

The Defendant's argument that the trial court's sentencing decision should not be afforded a presumption of correctness because the trial court was "required" to sentence her as an especially mitigated offender is without merit. The trial court may sentence a defendant as an especially mitigated offender if

(1) The defendant has no prior felony convictions; and

(2) The court finds mitigating, but no enhancement factors.

Tenn. Code Ann. § 40-35-109(a). While this finding may be appealed by either party, the "finding of an especially mitigating offender is discretionary with the trial court." Tenn. Code Ann. § 40-35-109(d), Sentencing Comm'n Cmts. We acknowledge that the Defendant in this case met the statutory elements to be sentenced as an especially mitigated offender.

However, pursuant to the plea agreement forms in the record, the Defendant agreed to be sentenced as a Range I, standard offender.

There is no dispute that the Defendant is eligible for judicial diversion. See Tenn. Code Ann. § 40-35-313(a)(1)(B). The decision to grant judicial diversion lies within the discretion of the trial court and will not be disturbed on appeal unless it is shown that the trial court abused its discretion. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). A denial of judicial diversion will not be overturned if the record contains any substantial evidence to support the trial court's action. Id. When making a determination regarding judicial diversion, the trial court must consider the following factors: (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's mental and physical health, and (6) the deterrent effect of the sentencing decision to both the defendant and other similarly situated defendants. State v. Lewis, 978 S.W.2d 558, 566 (Tenn. Crim. App. 1997).

The decision should be based on whether the grant of diversion will serve the ends of justice for both the public and the defendant. Lewis, 978 S.W.2d at 566. The record must reflect that the trial court considered and weighed all of these factors in arriving at its decision. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). Additionally, "[t]he court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others." Id. (citing State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993)). However, "[t]he denial of judicial diversion may be based solely on the nature and circumstances of the offense, so long as all of the other relevant factors have been considered, and this factor outweighs all others that might favorably reflect on the [d]efendant's eligibility." State v. George William King, No. M2001-02026-CCA-R3-CD, 2002 WL 31520648, at *4 (Tenn. Crim. App. Nov. 13, 2002) (citing State v. Curry, 988 S.W.2d 153, 158 (Tenn. 1999)).

The record reflects that the trial court considered and weighed all of the relevant factors in arriving at its decision. We agree with the Defendant that most of the diversion factors weighed heavily in favor of granting judicial diversion. However, there were also factors that weighed heavily against the granting of judicial diversion. The circumstances of the offense were egregious. The Defendant purchased a knife on her way to meet the victim and then lured the victim to her car, where she stabbed him twice with the knife. When the victim attempted to flee, the Defendant chased after him while yelling, "I'm going to kill you!" Additionally, the trial court's sentencing decision acted as a deterrent to the Defendant, who will likely have continued interactions with the victim, and other similarly situated defendants. We agree with the trial court's statement that it could not "send a message that if you're having issues in your marriage, [then] you can ambush your estranged spouse with a knife on a darkened road somewhere." Following our review, we believe that

the circumstances of the offense and the need for the deterrence of the Defendant and those similarly situated outweighed her lack of criminal record, her amenability to correction, and her positive social history. Accordingly, we conclude that the trial court did not abuse its discretion in denying judicial diversion because substantial evidence exists in support of its denial.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE