# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs December 18, 2013

## STATE OF TENNESSEE v. CHRISTOPER D. SEALS

**Direct Appeal from the Criminal Court for Hamblen County**
**No. 12CR031     John F. Dugger, Jr., Judge**

---

### No. E2013-00616-CCA-R3-CD - Filed May 9, 2014

---

The appellant, Christopher D. Seals, pled guilty to aggravated burglary, and the trial court imposed a sentence of three years in the Tennessee Department of Correction. On appeal, the appellant asserts that the trial court erred by denying judicial diversion and in determining the amount of restitution. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ROGER A. PAGE, J., joined.

Jonathan M. Holcomb, Morristown, Tennessee, for the appellant, Christopher D. Seals.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; C. Berkeley Bell, District Attorney General; and Kim Morrison, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### I.  Factual Background

The appellant and the State entered into a plea agreement, which provided that the appellant would plead guilty to aggravated burglary, a Class C felony, in exchange for a Range I sentence of three years and release eligibility after service of thirty percent of the sentence. The plea agreement further provided that the trial court would determine whether the application for judicial diversion should be granted and the amount of restitution.

At the hearing on diversion and restitution,[1] the State's version of the events underlying the guilty plea was as follows:

> [O]n 11/6/11 at 7:30[,] the [appellant and his co-defendant, Danny Carpenter,] went to the residence of Kenneth Hayes located at 625 Rosedale Avenue. Once there, [the appellant] made contact with the victim. The [co-]defendant, Danny Carpenter, waited in the vehicle. [The appellant] then got the victim to leave his residence and go to his workshop located behind his residence. At that time Danny Carpenter exited the truck and busted out the rear door glass at the residence and gained entry. Once inside the residence, he took the safe and – he being Mr. Carpenter – and its contents including miscellaneous paperwork, the vehicle titles and $30,000 in cash. He then went back to the truck and waited on [the appellant] to return to the truck and they then left and went to another location where they forced open the safe and got its contents.

The appellant agreed with the State's version of events, disputing only the amount taken from the victim.

The thirty-one-year-old appellant testified that he had a high school diploma, that he had graduated from "tech school" at Walters State Community College, and that he could read and write without difficulty. He stated that he had no mental or physical impairments. He further stated that he had not had any alcohol or drugs within the last twenty-four hours. He had never been granted judicial diversion and had never been charged with an offense that was classified as a Class A misdemeanor or higher.

The appellant said that when the police questioned him about his involvement in the crime, he confessed. At the time of his arrest, the appellant was working for the city of Morristown; however, he was fired because of the instant charges. At the time of the hearing, he was employed "at Team Tech," and he was seeking employment at "Chain Electric." In order to be hired, the instant conviction would have to be expunged. He attended Valley View Missionary Baptist Church.

On cross-examination, the appellant said that he gave the police two statements. In his first statement, he said that "the safe was open and [he] saw money and a lot of

---

[1] The trial court held a joint hearing to determine the amount of restitution the appellant and a co-defendant, Danny Carpenter, would pay.

paperwork and [he] received no money from the safe." In his second statement, the appellant said that he "took the safe and the papers and threw them off in the wood[s] towards the lake at the sewer treatment plant."

The appellant said that on the day of the offense, the victim worked on two chainsaws for the appellant. While the victim was in his workshop repairing the chainsaws, Carpenter went into the victim's house to get into the safe. The appellant said that Carpenter knew the victim had a safe because the victim was Carpenter's uncle.

The appellant said that he was "high" on pills at the time of the offense, namely Roxicodone and Xanax. He acknowledged that he did not "recall every single thing" that was in the safe.

When the court asked the appellant whether he was still using pills, the appellant responded negatively. However, when the court asked the appellant whether he could pass a drug test, the appellant admitted that he could not.

The court asked the appellant how much money was in the victim's safe. The appellant responded that the safe contained no more than $12,000, that he and Carpenter "split" the money, and that he received $4,500. The court stated, "You split it? Well, $4,500 twice is $9,000. You just said there was $12,000. So something is not matching up. I can add a little bit. . . . His half was 4,500." The appellant replied, "All right. We'll say $6,000. I know there was no more than $12,000 in the safe and we split the safe." The court asked if anything else was in the safe, such as jewelry, guns, or coins. The appellant said that the safe contained only the money and some papers.

Kenneth Clifford Hayes, the seventy-year-old victim, testified that his wife passed away approximately five years before the offense. Inside the safe was money his wife had obtained from her 401(k) and from a legal settlement. The victim said that he had not taken money from the safe since his wife's death and that he had never counted the money. He recalled that his wife counted the money one or two years prior to her death, and it amounted to $30,000. Additionally, the safe contained 254 two-dollar bills, some silver dollars, and his wife's "scholarship ring." The victim was unable to estimate the value of the coins. The victim said that after his wife passed away, he and the appellant were putting "insurance papers" in the safe and that the appellant "stuck his hands on in there and said, I've never seen this much money." The victim quickly shut the safe.

The victim said that he replaced the broken window himself and that the repairs cost approximately $10.

-3-

On cross-examination, the victim acknowledged that he never counted the money and that he was relying on his wife's word about how much money was in the safe. The victim stated, "I was with her 37 years. I should take her word." He said that "she counted it just before she died. I had set it on the table, on the big old table and she counted the money."

The trial court asked the victim if he ever counted the money in the safe. The victim said no, again explaining that his wife said there was $30,000 or $35,000. Defense counsel objected to that statement on hearsay grounds. The trial court responded, "Well, I'm going to weigh it with what he [is] saying. But I'm trying to figure out how he knew how much – what was in there."

The victim acknowledged that in the past four or five years, he had purchased a used automobile for $14,000. He said that his godfather, Johnny Sexton, paid $10,000, and the victim paid the remaining $4,000. The victim said that the $4,000 did not come from the safe.

At the conclusion of cross-examination, the victim asked the trial court why defense counsel approached him outside the courtroom offering him money. Upon further questioning, the victim said that defense counsel asked "how much [money] would I take to drop the thing on [the appellant]." The victim said that defense counsel told him the appellant was willing "to pay half of it back to get his freedom back." Defense counsel suggested the amount of $12,000, then asked, "How much will you take in a lump sum to drop it?" The victim said that he did not understand that the appellant was offering to pay restitution.

The victim said that regardless of whether he received restitution, he wanted the appellant to go to jail. He acknowledged that defense counsel asked whether "it would make a difference if [the appellant] paid the restitution to you in a lump sum as to whether or not he went to jail."

The victim stated that the theft "has about wrecked my life and my wife dying and them stealing my safe and everything, it's about ruined me." He said that the offense "has about wrecked my health." The victim said:

> [M]y mind is about gone for the last – they have run me from
> Sneedville to Morristown to have the trial and everything.
>
> . . . .
>
> My nerves and everything. I can't sleep at night. Every

-4-

time I shut my eyes, I see that boy's eyes right there [indicating the appellant]. I looked down on him when he was – when I was working on one of his chainsaws. And they was not nothing wrong with the chainsaws when he got me away from my house. And he grabbed up the chainsaws and run. . . .

The parties stipulated that the safe was worth approximately $150.

Georgina Rines, Carpenter's sister and the victim's grandniece, testified that before the offense, she helped the victim take care of his finances. The victim received a social security payment of $901 per month. The victim had a safe in his house; the key to the safe was kept on a ring that was hung on the wall behind the mantle. A couple of months after the death of the victim's wife, she and the victim put his wife's credit cards and driver's license into the safe. She saw that there was a lot of money in the safe and that the victim's wife had "paper clips with little pieces of paper that had the amounts on it but what amounts I didn't look."

Rines said that the victim called her after he realized the safe was gone. He showed her a paper reflecting that his wife had received $17,000 from a legal settlement. Rines said that the victim had a checking account in which he kept around $1,000. She did not know how the victim paid for his car.

On cross-examination, Rines clarified that the victim's wife obtained $17,000 from the settlement but that she did not know how much money was in the wife's retirement account.

Danny Wayne Carpenter testified that he gave a statement after he was arrested for breaking into the victim's house, acknowledging that he took $12,000 from the safe. He said that he did not see any coins in the safe but that he did see a number of $2 bills. He and the appellant evenly divided the money from the safe; Carpenter's share was exactly $6,000. They spent $2,500 of the money on drugs.

On cross-examination, Carpenter said that after he took the safe, he and the appellant drove to a boat ramp near a bridge in Grainger County, removed the safe from the car, and "busted the safe" open.

Martha L. Dalton, the victim's sister, testified that she was with the victim when defense counsel spoke with him outside the courtroom. Dalton said that defense counsel "asked him how much he would take to drop it, I guess, and clear with the – so he wouldn't have that on his record." Dalton said that defense counsel asked the victim if he would "take

a lump sum and drop it." Defense counsel did not mention the word "restitution." Defense counsel "asked for the – what was stolen and they [he] asked for a sum, would [the victim] take a sum and drop the charge so the boy's name would be cleared."

After the witnesses testified, the trial court noted that the appellant had requested judicial diversion. Defense counsel argued that if the trial court were to grant judicial diversion, the appellant would be able to get a better job and would thereby be able to pay restitution to the victim. The court asked if the appellant could pay restitution on the day of the hearing. Defense counsel said, "No, Your Honor. We tried to come up with it all today and we can't. We don't – we don't know what the amount will be." The court observed that the crime happened in 2011, which was almost two years earlier, and that the appellant had only recently obtained employment.

In examining the factors for granting judicial diversion, the court said:

> Is the accused[] amenab[le] to corrections? Possibly he could have been amenable to corrections but he testified here today that he couldn't pass a drug test; he's still on – still taking drugs recently. The purpose – and what drove this crime was drugs, pills, prescription drugs.
>
> Circumstances of the offense: In this case the crime, that [the appellant] was very instrumental in causing this crime to have happened. He lured the elderly victim away from his home to a garage area and the guy is working on chainsaws, and this was a large theft, and Mr. Hayes said that this has affected his health and he lays in bed at night and still looks – can see the [appellant's] eyes looking at him when he worked on that chainsaw. Circumstances aren't good.
>
> The accused's criminal record: He doesn't have a criminal record. His social history: He has education but he also has drug issues. Drugs caused this crime and he's still taking drugs. So the social history is not good and mental health.
>
> The status of the accused's physical and mental health: There's not been any evidence presented on his physical and mental health. Physical health appears to be good. Mental health, no evidence of that.

Deterrence value to the accused as well as others: Well, other people need to be deterred. There are thousands of thefts in East Tennessee and people are preying on the elderly. I see it. Disposed of over 2,000 cases last year and I – the elderly, that's – these prescription addicts are preying on the elderly to get money for their habit. And other people need to be deterred from going in an elderly person's home because frequently that causes them, as Mr. Hayes says, great mental anguish to be a victim. So, other people need to be deterred. And that goes against a judicial diversion in the Court's opinion.

Whether judicial diversion will serve the interest of the public as well as the accused: The [appellant] still has a drug issue, he would test positive. Couldn't pass a drug test today he testified to. Public, I don't think it will serve the interest of the public. These thefts and prescriptions is so great at this time, the problems, it's unbelievable the amount of these cases that it's happened. So, the Court finds that a judicial diversion will not serve the interest of the public. People that go into an elderly person's house and commit a theft on them need to serve some time.

Accordingly, the court denied judicial diversion.

Regarding restitution, the trial court said that the appellant's account of the amount of money in the safe was not credible. In support of its finding, the court noted that the appellant initially stated that his half of the money was $4,500; thereafter, he said, "[L]et's say it's 12." Carpenter, who was in the courtroom at the time, heard the testimony and asserted that the safe held exactly $12,000. The court further noted that the appellant and Carpenter admitted taking drugs the day of the offense and could not recall what happened to the coins, $2 bills, and the ring that were in the safe. The court accredited the victim's testimony regarding the amount of money in the safe, stating that the victim's wife had counted the money and said it totaled $30,000. Additionally, the victim's niece saw the "money in stacks with paper clips and amounts [on] it." The court found, "[I]t's more the weight should to go what the victim says was in there." The court stated that it was "outrageous" that the appellant and Carpenter victimized an elderly man, who was Carpenter's "blood relative," to obtain money for drugs. The court said:

The plea paperwork for Mr. Carpenter had an amount on it that was agreed to by the State[, which was $15,250,] and that's

going to be the – and that was signed – and that's going to be the amount that they should pay. Because [the appellant], he was just like, Well, let's just say it's 12. That doesn't sound like anybody that said we counted it and divided it and it was 12. Not to me. . . . Mr. Hayes is more – a lot more reliable than anything that's come out of these two guys. And it's affected him, clearly, by his testimony.

The court determined that the appellant should pay $15,250 in restitution. However, he cautioned the victim, "[D]on't go spending that money and count on that. . . . There's a lot of people owe a lot of restitution and it's like getting blood out of turnips."

On appeal, the appellant challenges the trial court's denial of judicial diversion and the amount of restitution imposed.

## II. Analysis

The appellant maintains that the trial court did not fully consider the relevant factors in determining whether the appellant should be granted judicial diversion. Additionally, the appellant contends that the trial court erred in determining the amount of restitution, specifically complaining that "the record is entirely void of admissible evidence dealing with the amount of restitution."

A defendant is eligible for judicial diversion when he or she is found guilty of or pleads guilty to a Class C, D, or E felony and has not previously been convicted of a felony or a Class A misdemeanor. See Tenn. Code Ann. § 40-35-313(a)(1)(B). In determining whether to grant a defendant judicial diversion, the trial court must consider all of the following factors: (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the status of the defendant's physical and mental health, and (6) the deterrence value to the defendant and others. State v. Lewis, 978 S.W.2d 558, 566 (Tenn. Crim. App. 1997). "'The trial court should also consider whether judicial diversion will serve the ends of justice – the interests of the public as well as the accused.'" Id. (quoting State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993)). The record must reflect that the trial court has taken all of the factors into consideration. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). As a consequence, "we may not revisit the issue if the record contains any substantial evidence supporting the trial court's decision." Id. Furthermore, "[t]he court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others." Id. Recently, in State v. Kiara Tashawn King, __ S.W.3d __,

No. M20012-00236-SC-R11-CD, slip op. at 12 (Tenn. at Nashville, Apr. 23, 2014), our supreme court held that

> when the trial court considers the Parker and Electroplating factors, specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion, the appellate court must apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision.

In the event "the trial court fails to consider and weigh the applicable . . . factors," this court "may either conduct a de novo review or, if more appropriate under the circumstances, remand the issue for reconsideration." Id. We conclude that the trial court properly considered the factors announced in Parker and Electroplating and that the trial court did not err by denying judicial diversion.

The appellant complains that the trial court attributed great weight to the victim's preference regarding whether to incarcerate the appellant, that the court focused on the effect of the crime on the victim, that the court failed to note that the appellant had sought and obtained employment since his arrest, that the court ignored the appellant's adherence to the conditions of his bond, and that the trial court failed to consider that the appellant had "not gotten into any other trouble."

The trial court found that the appellant was not amenable to correction, noting that the appellant committed the offense while he was on drugs and that, after repeated questioning, the appellant eventually acknowledged that he could not pass a drug test on the day of the hearing. The court found that the circumstances of the offense "aren't good" and warranted the denial of diversion. The court noted that the appellant lured the elderly victim away from his home while his co-defendant, Carpenter, robbed the victim of a large amount of money. The victim's health declined after the offense, and he still suffered from psychological trauma. The court observed that the appellant did not have a criminal record, that his physical health was good, and that he was educated. However, the court further observed that the appellant's social history was poor in light of his continued drug use. The court stated that similar crimes needed to be deterred, noting that the court had seen a number of similar cases in which "prescription addicts [preyed] on the elderly to get money for their habit." The court found that the needs of the appellant and the public would not be served by judicial diversion.

In order to establish the need for deterrence, proof such as "testimony by someone with special knowledge of the level of a particular crime" must be adduced at the hearing.

State v. Hooper, 29 S.W.3d 1, 11 (Tenn. 2000). A court may not rely solely upon its "general observation that a particular offense occurs frequently within the county." State v. Cynthia Denise Marshall, No. W2012-01011-CCA-R3-CD, 2013 WL 257050, at *3 (Tenn. Crim. App. at Jackson, Jan. 23, 2013) (citing State v. Fields, 40 S.W.3d 435, 442 (Tenn. 2001)); see also State v. Deon Marquett Boykins, No. W2012-01012-CCA-R3-CD, 2013 WL 1229393, at *3 (Tenn. Crim. App. at Jackson, Mar. 27, 2013). Therefore, we conclude that the trial court lacked sufficient evidence to deny the appellant's request for judicial diversion based upon the need to deter the appellant and others.

Regardless, a defendant's "current drug usage" is a relevant consideration in determining whether judicial diversion is appropriate. Lewis, 978 S.W.2d at 566. Further, we note that the trial court questioned the appellant's credibility. Specifically, the court observed that the appellant originally claimed that he received $4,500 from the offense; however, upon further questioning by the court, the appellant said, "We'll say $6,000 [was his take]." Further, the appellant initially denied that he was still using drugs; however, when the trial court questioned if he would pass a drug test, the appellant conceded that he would not pass the test. The appellant's lack of candor reflects poorly upon his amenability to correction. State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999). Moreover, "[t]he denial of judicial diversion may be based solely on the nature and circumstances of the offense, so long as all of the other relevant factors have been considered, and this factor outweighs all others that might favorably reflect on the [d]efendant's eligibility." State v. George William King, No. M2001-02026-CCA-R3-CD, 2002 WL 31520648, at *4 (Tenn. Crim. App. at Nashville, Nov. 13, 2002) (citing State v. Curry, 988 S.W.2d 153, 158 (Tenn. 1999)). Our review of the record reveals that the trial court considered and weighed all of the necessary factors before denying diversion. The trial court stated its reasons for denying diversion, especially noting why the circumstances of the offense, the appellant's continued drug use, and the appellant's lack of candor outweighed the other factors. Accordingly, we conclude that the trial court did not err in denying diversion.

Generally, the amount of restitution that the defendant may be directed to pay is limited to "the victim's pecuniary loss." See Tenn. Code Ann. § 40-35-304(b). Further, "[a] victim seeking restitution must present sufficient evidence so the trial court can make a reasonable determination as to the amount of the victim's loss." State v. Bottoms, 87 S.W.3d 95, 108 (Tenn. Crim. App. 2001). This court has held that "the appropriate standard of review for restitution orders is the abuse of discretion standard with a presumption of reasonableness." State v. David Allan Bohanon, No. M2012-02366-CCA-R3-CD, 2013 WL 5777254, at *5 (Tenn. Crim. App. at Nashville, Oct. 25, 2013) (citing Bise, 380 S.W.3d at 708 and State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012)).

The appellant contends that the trial court determined the amount of restitution based

upon hearsay. We note that Tennessee Code Annotated section 40-35-209(b) provides that in a sentencing hearing, reliable hearsay is admissible as long as a defendant "is accorded a fair opportunity to rebut any hearsay evidence so admitted." In the instant case, the trial court found that the appellant and Carpenter were not credible about the amount of money taken, noting that they were "high" at the time of the offense. The court further noted that the appellant and Carpenter gave conflicting accounts regarding the amount, indicating that they probably did not know how much money was taken. Additionally, we note that Rines testified that there was a lot of money in the safe and that the victim's wife had "paper clips with little pieces of paper that had the amounts on it." Rines also saw a paper reflecting that the victim's wife had received $17,000 from a legal settlement. The trial court found that the victim's testimony regarding the amount of money in the safe was reliable hearsay. We agree.

Finally, the appellant asserts that the trial court failed to consider his ability to pay in determining the amount of restitution imposed. However, the appellant did not raise this issue in the trial court. Therefore, he has waived the issue. See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Accordingly, we conclude that the trial court did not abuse its discretion in imposing restitution in the amount of $15,250.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE